[No. 70607-7.   En Banc.]
Argued March 29, 2001.     Decided May 9, 2002.

JANET JONES, ET AL., *Respondents*, v. ALLSTATE INSURANCE COMPANY, ET AL., *Petitioners*.

*Thomas J. Collins* (of *Merrick, Hofstedt & Lindsey, P.S.*); *John D. Lowery* and *James R. Brigman* (of *Riddell Williams, P.S.*); and *Michael S. Rogers* and *Marilee C. Erickson* (of *Reed McClure*), for petitioners.

*John Budlong*, for respondents.

*Timothy J. Parker* and *James E. Lobsenz* on behalf of National Association of Independent Insurers, amicus curiae.

*Jean Magladry* on behalf of United Policyholders, amicus curiae.

*Bryan P. Harnetiaux* and *Debra L. Stephens* on behalf of Washington State Trial Lawyers Association Foundation, amicus curiae.

*Jan Eric Peterson* and *Mark A. Clausen* on behalf of Washington State Bar Association, amicus curiae.

BRIDGE, J. — We are asked to determine whether an insurance company's claims adjuster who developed a nonadversarial relationship with an unrepresented claimant was practicing law when she completed claims forms, advised the claimants regarding the settlement process, and recommended that the claimants sign a complete settlement and release without advising them that there were potential legal consequences or referring them to independent counsel. We hold that the actions of the claims adjuster in this instance constituted the practice of law. The insurance company and its adjusters will be allowed to continue this practice, however, provided they abide by the standard of care of a practicing attorney.

More specifically, we find that Allstate Insurance Company's (Allstate) employee's conduct fell below the standard of care of a practicing attorney when she did not disclose her conflict of interest, advised the claimants, Janet and Terry Jones, to sign the release of all claims arising from the accident, and did not either properly advise the Joneses that there were potential legal consequences of signing Allstate's settlement check and release or refer them to independent counsel. Because no injunctive relief is requested, we do not reach the issue of whether the conduct of Allstate's employee constitutes the *unauthorized* practice of law and hence is subject to being enjoined.

Thus, we affirm the trial court and remand for consideration of the Joneses' bad faith and civil fraud claims (Consumer Protection Act, chapter 19.86 RCW) against Allstate, for consideration of the Joneses' remaining claims against Allstate and the other parties, and for the awarding of damages. On remand, because Jeremy France has not shown that the accord between Allstate and the Joneses was reached in good faith and with full revelation, he may not assert an affirmative defense based on the existence of an accord and satisfaction.

## FACTS

On November 21, 1997 Jeremy France ran a stop sign and broadsided the vehicle driven by Janet Jones, hitting it on the driver's side. Jones was driving a 1992 Plymouth Voyager van. She sustained severe facial injuries, including damage to her right eye. Her scalp was peeled back and she was rendered unconscious from the impact. Jones was airlifted to the Harborview Trauma Center, where she was listed in serious but stable condition. An officer spoke with Terry, Janet's husband, and told him it did not appear that his wife had been wearing a seat belt because the emergency personnel did not have to remove her seat belt to extricate her from the car. Terry Jones said that it would be unlike his wife not to wear a seat belt and that they had had

trouble in the past with the seat belt not latching properly. An examination of the seat belt found that it would not lock into the floor mounted receiver. The release button was pulled up above the locking receiver and would not reset; it appeared that it was pulled out under force. Janet Jones' medical expenses for her hospital stay totaled nearly $75,000. She has undergone surgery on subsequent occasions both to insert plates into her face and head and to remove a plate.

On November 24, three days after the accident, Christy Klein, claims adjuster for Allstate, sent Janet Jones a letter, the first paragraph of which states:

> Although we spoke on 112497,[1] I want to reaffirm Allstate's policy that we will provide quality service to anyone who has been involved in an accident with one of our policyholders. As *your claim representative*, my role is to ensure that you receive this quality service, outlined in the enclosed "Quality Service Pledge."[2]

The Quality Service Pledge, a single sheet of information, promises the following: "Because you have been involved in an accident with an Allstate policyholder, we will provide you with quality service. . . . *Your* claim representative is dedicated to carrying out this Quality Service Pledge."[3] At the time of Janet's accident, Allstate separated its claim functions into represented and unrepresented claimants. Allstate adjusters, such as Klein, were instructed to act as the individual's claim representative for unrepresented claimants.

Over the next two months Klein called Terry Jones frequently—assisting Jones in identifying Janet's medical coverage, finding insurance to pay the medical bills, and obtaining subrogation waivers. Terry Jones recalls that he had extensive contact with Klein and that she helped him:

---

[1] Klein actually spoke with Terry Jones, not Janet. Br. of Resp'ts at 5-6; Pet'r Allstate's Opening Br. at 8.

[2] Clerk's Papers (CP) at 241 (emphasis added).

[3] CP at 243 (emphasis added).

"Almost daily I would talk to her and ask her, you know, she was helping me. She was helping me get the bills paid and helping me with my insurance company. She got my insurance company to pay benefits to me."[4] Terry Jones estimated that payment was $30,000 in underinsured motorist coverage from Farmers, the Joneses' insurer. Jones stated that Klein was more helpful to him than his own insurance company.

In early December 1997 Terry Jones met with two attorneys to discuss a possible seat belt product liability claim. This claim would have been independent of any claim involving Allstate or the Frances. Jones did not consult with either attorney to obtain advice about settling the claim against France nor did he discuss Allstate's offer to settle the claim.[5] Jones later informed Klein that he had met with the lawyers to discuss the possible seat belt claim, but had not retained them. Klein told Jones that she could not represent him if he hired an attorney.

In January 1998 Klein sent Janet Jones a letter, a check, and a release form. The letter explained that Klein had been speaking to Terry about the settlement, briefly described the terms of the settlement, and urged Janet to sign the release form:

> Thank you for your time today to discuss the settlement of Janet's medical claim against Allstate Insurance. Allstate has issued payment of $25,000.00 payable to you which represents the bodily injury limits on our insureds [sic] policy. Also enclosed are forms for the Release of this Claim. Please sign the original form and return to me in the enclosed envelope.[6]

---

[4] CP at 262; Dep. of Terry Jones at 151.

[5] The dissent argues that a question of material fact exists "whether any damages were proximately caused by the claims adjuster's breach of duties given the Joneses' meetings with two attorneys." Dissent at 324. However, the Joneses did not discuss with either attorney their claims or settlement offers with Allstate or the Frances. Thus, the Joneses never sought this advice from an alternate source, and were relying on Klein as their "claims representative."

[6] CP at 245.

The letter also contained the heading, "Settlement of your medical claim for Janet Jones."[7] The check listed Roy and Amy France as the insured and was made to the order of Janet Jones for $25,000. In the space for "in payment of" the check had this phrase typed in: "FINAL SETTLEMENT OF ANY AND ALL CLAIMS ARISING FROM BODILY INJURY CAUSED BY ACCIDENT ON 11/21/97."[8] The release form was more consistent with the check than with the letter. The release, a mixture of preprinted and hand-written words, contained this heading, "RELEASE OF ALL CLAIMS," and stated: "[I]n consideration of the sum of Twenty Five thousand and xx/100 Dollars ($25,000.00) . . . I do hereby release and forever discharge Roy & Amy France, Jeremy France, & Allstate Insurance Co. and any other person, firm or corporation charged or chargeable with responsibility . . . from any and all claims . . . and causes of action."[9] The Post-it note on the release said, "Please sign and return to my attn. Thanks Christy."[10] Janet Jones signed and deposited the check.

After reading the release, Terry Jones felt that both he and Janet should not sign it because it appeared that they would thereby be giving up all of their claims. In September 1998 the Joneses attempted to return the money by writing Allstate a check for $25,000, but Allstate returned the check and said that it considered the Joneses' claim settled and closed. According to the Joneses, if the release and settlement were enforceable, they would discharge vicarious and joint and several liability and preclude full compensation. To the Joneses, if the settlement were effective, their car manufacturer would be severally liable only for damages.

The Joneses filed their initial complaint on January 22, 1999 against Allstate, Jeremy France, and Roy and Amy France, Jeremy's parents and owners of the car Jeremy

---

[7] *Id.*

[8] *Id.*

[9] CP at 249.

[10] *Id.*

drove in the accident. In their first amended complaint, filed on September 29, 1999, the Joneses added DaimlerChrysler A.G. as a defendant.

On December 8, 1999, the Joneses filed a motion for partial summary judgment, asking the court to find that Allstate engaged in the unlicensed, negligent practice of law by selecting and drafting release and settlement instruments, misrepresenting the terms of these instruments to the Joneses, and advising them to sign the instruments. Allstate opposed the motion and filed a cross-motion for summary judgment. The Frances also moved for summary judgment on the basis that the Joneses' claims against them were barred by the existence of accord and satisfaction.

On January 14, 2000 the trial court issued an order granting the Joneses' motion and denying Allstate's. The court granted the motion "on grounds that under Washington law, defendant Allstate Insurance Company engaged in the unauthorized, negligent practice of law and breached its fiduciary duties to the Joneses in representing the Joneses on their claims against the Frances."[11] The trial court found Allstate liable for any legally recoverable damages that the Joneses prove were proximately caused by Allstate's actions. In an oral decision, the court reasoned that claims adjusters are able to avoid the unauthorized practice of law when they maintain a plainly adversarial posture between themselves and the person with whom they are working. On the other hand, in this case, the court found an absence of a plainly adversarial posture. Although maintaining the adversarial posture in form, Allstate's agent's conduct, in the court's view, could reasonably cause a person to believe the agent was not an adversary.

The court also concluded that Allstate's agent was negligent in advising the Joneses to sign the release or in allowing them to sign it without advising them that there were consequences, especially the effect of the release on

[11] CP at 439.

the Joneses' potential claims based on joint and several liability.[12] Finally, the court concluded that Allstate had a conflict of interest in representing both the Joneses and Jeremy France; Allstate's duty to the Frances to settle within the policy limits conflicted with the duty to fully inform the Joneses of the consequences of their release.

In a separate order issued on January 18, 2000, the trial court denied the Frances' motion for summary judgment and granted the Joneses' cross-motion to strike Frances' affirmative defense based on release and accord and satisfaction.

Allstate filed a motion for discretionary review with Division One of the Court of Appeals on February 25, 2000, and Jeremy France filed a similar motion on March 2. Roy and Amy France entered into a settlement agreement with the Joneses under which the Frances stipulated to have a $1.2 million judgment entered against them.

The Court of Appeals granted discretionary review on July 25, 2000. After determining that this case involved an issue of broad public import, the Court of Appeals certified the case to this court on December 11, 2000. The commissioner of this court agreed that the case warranted direct review and we accepted certification on January 16, 2001.

## ANALYSIS

The standard of review of an order of summary judgment is de novo, and the appellate court performs the same inquiry as the trial court. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). The court considers the facts and the inferences from the facts in a light most favorable to the nonmoving party. *Bremerton Pub. Safety Ass'n v. City of Bremerton*, 104 Wn. App. 226, 230, 15 P.3d 688 (2001) (citing *Reid v. Pierce County*, 136 Wn.2d 195, 201, 961 P.2d 333 (1998)). The court may grant summary judgment if the pleadings, affidavits, and depositions estab-

---

[12] Actually Klein advised the Joneses to sign the release, but they did not sign the release, only the check.

lish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Lybbert*, 141 Wn.2d at 34.

## I

Allstate and Jeremy France assign error to the trial court's determination on summary judgment that Allstate engaged in the negligent, unauthorized practice of law and thereby breached a fiduciary duty it owed to the Joneses.

The inquiry into whether an activity constitutes the practice of law has two steps: the determination as to whether the activity is the practice of law and, if so, determining whether the practice is unauthorized:

> It is the nature and character of the service performed which governs whether given activities constitute the practice of law. If the nature and character of the activities result in a determination that the activities are the practice of law, the subsequent inquiry becomes whether the one undertaking such practice is authorized to do so. Hence, in considering the trial court's conclusion of law, we are only concerned with whether the nature and character of the activities involved warrant the conclusion that *anyone* undertaking them is engaged in the practice of law.

*Wash. State Bar Ass'n v. Great W. Union Fed. Sav. & Loan Ass'n*, 91 Wn.2d 48, 54, 586 P.2d 870 (1978) [hereinafter *Great Western*] (citation omitted).

The first step is to determine whether any activity performed by Allstate in this case constitutes the practice of law. The well-settled definition of the "practice of law" in Washington case law includes three categories of activities:

> It is now a generally acknowledged concept that the term "practice of law" includes not only the doing or performing of services in a court of justice, in any matter depending therein, throughout its various stages, and in conformity with the adopted rules of procedure, but *in a larger sense includes legal advice and counsel, and the preparation of legal instruments and contracts by which legal rights are secured.*

*In re Disciplinary Proceedings Against Droker & Mulholland*, 59 Wn.2d 707, 719, 370 P.2d 242 (1962) (emphasis added). The trial court here cited additional attributes of the practice of law contained in *State v. Hunt*, 75 Wn. App. 795, 802, 880 P.2d 96 (1994). " '[T]he selection and completion of form legal documents, or the drafting of such documents, including deeds, mortgages, deeds of trust, promissory notes and agreements modifying these documents constitutes the practice of law.' " *Id.* at 802 (quoting *Great Western*, 91 Wn.2d at 55). "Also, when 'one determines for the parties the kinds of legal documents they should execute to effect their purpose, such is the practice of law.' " *Id.* at 802 (quoting *Hecomovich v. Nielsen*, 10 Wn. App. 563, 571, 518 P.2d 1081 (1974)). In *Great Western* we held that services that are ordinarily performed by licensed lawyers and that involve legal rights and obligations constitute the practice of law. 91 Wn.2d at 55.

The trial court concluded that Allstate claims adjuster Christy Klein's actions constituted the types of services described in *Hunt* as practicing law. Oral Decision (OD) at 46. Claims adjusters prepare legal instruments, which secure legal rights. *Id.* at 46-47. However, a plainly adversarial posture generally prevents the typical claims adjuster from engaging in the unauthorized practice of law. *Id.* at 47. Here the trial court found that Klein had embarked on a course of conduct which could reasonably cause a person to believe that she was *not* an adversary and her relationship with the Joneses thus began to mimic an attorney-client relationship. *Id.* The advice Klein gave the Joneses—that they should sign the release—without advising them of the consequences, was negligent conduct in the court's view. *Id.* at 47-48.

Allstate concedes that, of the three main classes of activities constituting the practice of law, only the third, the preparation of legal instruments and contracts, applies to Klein's actions. Pet'r Allstate's Opening Br. at 17-18. Allstate asserts, however, that the trial court failed to consider that Klein's conduct fit within an exception estab-

lished in *Perkins v. CTX Mortgage Co.*, 137 Wn.2d 93, 104-06, 969 P.2d 93 (1999), for the mere clerical entry of data into a printed legal form. Pet'r Allstate's Opening Br. at 21. In *Perkins* a mortgage lender charged a fee for the production and completion of loan documents.

According to Allstate, the *Perkins* court authorized the preparation of legal documents when lay employees participating in such document preparation do not exercise any legal discretion. *Perkins*, 137 Wn.2d at 106; Pet'r Allstate's Opening Br. at 21. Applying this exception to the Joneses' case, Allstate asserts that Klein did not exercise any legal discretion with respect to the preparation of the release or check. Pet'r Allstate's Opening Br. at 21-22. Allstate claims that Klein simply followed the standard practice for the settlement of claims—inserting objective data in the preprinted release form and sending the Joneses a computer-generated settlement check. *Id.* at 21.

*Perkins*, however, does not support Allstate's contention. This court in *Perkins* held that the activities at issue in that case *did* constitute the practice of law. *Perkins*, 137 Wn.2d at 97-98. Those activities, as here, involved "the selection and completion of legal instruments by which legal rights and obligations are established." *Id.* at 97. The passages quoted by Allstate concern the second test in the inquiry: whether the court should consider such activities authorized. This court has resolved that question by balancing the need to protect the public from the harm of the lay exercise of legal discretion with the provision of convenient and low cost services. *Id.* at 105-06. In *Perkins* we held the activities of the mortgage lenders were authorized provided they complied with the standard of care of a practicing attorney. *Id.* Applying *Perkins* to this case, we find that Klein's conduct, even if she did nothing more than enter objective data onto printed legal forms, constitutes the practice of law. "The practice of law includes the selection and completion of legal instruments by which legal rights and obligations are established." *Id.* at 97.

The next question is whether, as in *Perkins*, this court should permit such activity. Weighing the competing interests, the *Perkins* court decided that it would permit mortgage lenders to prepare loan documents because the risk of public harm was low as compared to the benefit the public received. *Id.* at 106. The *Perkins* facts indicated that the risk of public harm was low because there was no allegation by the appellants that their loan documents were deficiently drafted or that their legal rights were prejudiced. *Id.* Thus, this court held that lenders were authorized to prepare legal documents in such a manner, with a condition: "in order to fully safeguard the public interest we . . . hold that lenders must comply with the standard of care of a practicing attorney when preparing such documents." *Id.*

Similarly, this court in *Cultum v. Heritage House Realtors, Inc.*, 103 Wn.2d 623, 631, 694 P.2d 630 (1985), allowed licensed brokers and salespersons to complete form earnest money agreements because of the practical interests and needs of the public. *Id.* However, we decided that the licensing requirements were insufficient to protect the public against incompetence, divided loyalties, and other evils. *Id.* Therefore, we held "that licensed real estate brokers and salespersons, when completing form earnest money agreements, [are practicing law and] must comply with the standard of care of a practicing attorney."[13] *Id.*

■ Here, the Joneses make a stronger case than the plaintiffs in *Perkins* not only that the activities of the claims adjuster were the practice of law, but that by engaging in the practice of law they must be held to the standard of care of a practicing attorney. Unlike *Perkins*, in this case the Joneses have alleged harm in the form of prejudice to their legal rights. They were potentially foreclosed from asserting joint and several liability against other claimants based

---

[13] On this point, the four members of the concurring opinion in *Cultum* joined the four members of the lead opinion: "The ultimate protection to the public is the requirement that the broker/salesperson be held to the standard of care of a practicing lawyer." *Cultum*, 103 Wn.2d at 636 (Brachtenbach, J., concurring).

on Klein's advice. They lost potential settlement income and "settled" at an amount that represented a fraction of their medical expenses. Thus Klein went beyond the actions of a mere scrivener when she advised the Joneses to sign the release and failed to advise them of the consequences or to refer them to independent counsel. Therefore, to safeguard the public interest, we hold that insurance claims adjusters, when preparing and completing documents which affect the legal rights of third party claimants and when advising third parties to sign such documents, must comply with the standard of care of a practicing attorney.

Having determined that Allstate's claims adjusters are practicing law in these circumstances and having decided to permit the employees' activities to continue provided the adjusters comply with the standard of care of a practicing attorney, we need not decide the issue of whether the activities are *unauthorized*. The question of whether the practice of law is authorized becomes central only when the plaintiffs seek to enjoin or prohibit the practice.[14] This court is not being asked to issue an injunction, but instead to determine whether Allstate had a duty, the breach of which could support a claim against Allstate for negligence.[15]

---

[14] Even amicus Washington State Bar Association, while concluding that Allstate is engaged in the unauthorized practice of law, recommends that Allstate should be subject to liability for resulting damages rather than be enjoined from some of its claims-adjusting activities. Br. of Amicus Curiae Washington State Bar Ass'n at 1. If Allstate continues in this vein, without conforming to the standards of legal counsel, their actions would constitute the unauthorized practice of law and they would be subject to an injunction.

[15] The Joneses' second amended complaint, filed after the trial court issued its summary judgment order in their favor, does pray "for an order enjoining Allstate under RCW 19.86.090 from engaging in the unauthorized practice of law by selecting, drafting or filling out any release or settlement instruments for any unrepresented claimant to whom it has issued an 'unrepresented claimant' form letter, Quality Service Pledge or comparable communication, and for such other relief as the court shall deem just and proper." CP at 1142. Since such relief was not requested earlier, summary judgment was not granted with that in mind. Nor is such relief requested in the Joneses' briefing on review.

## II

Allstate next argues that even if its claims adjusters are engaged in the practice of law, no duty was owed to the Joneses.[16] Allstate cites *Bohn v. Cody*, 119 Wn.2d 357, 363, 832 P.2d 71 (1992), in support of its contention that there was no attorney-client relationship between Klein and the Joneses. Pet'r Allstate's Opening Br. at 11 n.7. "The essence of the attorney/client relationship is whether the attorney's advice or assistance is sought and received on legal matters." *Bohn*, 119 Wn.2d at 363. "The existence of the relationship 'turns largely on the client's subjective belief that it exists.'" *Id.* (quoting *In re Disciplinary Proceeding Against McGlothlen*, 99 Wn.2d 515, 522, 663 P.2d 1330 (1983)). Allstate devotes significant portions of its briefing to arguing that the Joneses neither sought legal advice from Klein nor subjectively believed that she was acting as their attorney. See Petitioner Allstate's Opening Brief at 10-13 and citations to the record therein.

However, we do not need to find that the Joneses were Klein's client to determine that Allstate owed a duty akin to that of an attorney to the Joneses. While *Bohn* discusses the obligations due in an attorney-client relationship, *Bohn* also states that an attorney may owe a duty of care to a third party.[17] *Bohn*, 119 Wn.2d at 362-63. *Bohn* recognizes that "[u]nder certain circumstances, an attorney may be held liable for malpractice to a party the attorney never represented." *Id.* at 365. To assess whether a duty is owed to a third party, *Bohn* applies a multifactor balancing test adopted in *Bowman v. John Doe*, 104 Wn.2d 181, 188, 704 P.2d 140 (1985), and recognized in *Stangland v. Brock*, 109

---

[16] The dissent alleges that we have failed to address an issue raised by Allstate—whether the trial court erred in granting summary judgment on the grounds that Allstate breached a fiduciary duty to the Joneses. Dissent at 324. Yet, this entire section of our opinion is devoted to the duty Allstate owes to the Joneses. Although we state the duty slightly differently than the trial court, we ultimately find that summary judgment is appropriate here.

[17] Our citation of *Bohn* is not in any way intended to expand an attorney's duties toward third parties.

Wn.2d 675, 680, 747 P.2d 464 (1987). Under the test a court will evaluate:

> "the extent to which the transaction was intended to affect the plaintiff; the foreseeability of harm to the plaintiff; the degree of certainty that the plaintiff suffered injury; the closeness of the connection between the defendant's conduct and the injury; the policy of preventing future harm; and the extent to which the profession would be unduly burdened by a finding of liability."

*Bohn*, 119 Wn.2d at 365 (quoting *Stangland*, 109 Wn.2d at 680). The inquiry under this multifactor test has traditionally focused on whether the attorney's services were intended to *affect* the plaintiff. *Id.* In *Trask v. Butler*, 123 Wn.2d 835, 872 P.2d 1080 (1994), we changed "affect" to "benefit," noting that the alteration represented the threshold inquiry. *Id.* at 842-43 ("under the modified multifactor balancing test, the threshold question is whether the plaintiff is an intended beneficiary of the transaction to which the advice pertained").

Applying this modified test we conclude that Klein owed the Joneses a duty. The essence of the duty owed in this circumstance is that of an attorney to an unrepresented third party. The Joneses were at least one of the intended beneficiaries of the transaction to which Klein's advice pertained.[18] *Trask*, 123 Wn.2d at 843. Klein acted with the intent to influence the Joneses' decisions. Klein intentionally developed a trusting relationship with the Joneses. Klein knew or should have known that if the Joneses deposited the check and signed the release they would abandon all other potential claims arising from the accident. Additionally, the $25,000 recovery would not only fall far short of Janet's then nearly $75,000 in medical bills, but the Joneses would lose other remedies as well. Thus, Klein's actions directly impacted the Joneses with the certainty that they could be harmed by foreclosing other claim and

---

[18] The dissent agrees that there was an intended benefit to the Joneses sufficient to pass the *Trask* threshold, and that a duty to the Joneses arose under the *Bohn/Trask* analysis. Dissent at 319-20.

settlement options. Furthermore, with the intent to protect future insurance claimants from harm, we hold that Klein's activities heretofore described constituted the practice of law. Therefore, we impose this limited duty of care to safeguard the public interest, which outweighs any burden Allstate would endure by complying with an attorney's professional standard of care.

■ In addition to *Bohn* and *Trask*, an independent basis for a duty exists where this court finds that an activity, though not provided by an attorney, actually constitutes the practice of law, yet we allow that activity to continue provided that persons engaged in that activity are held to the standard of care of a practicing attorney. *See Perkins*, 137 Wn.2d at 106; *Cultum*, 103 Wn.2d at 631. In holding that Klein was engaged in the practice of law, without determining whether that practice was unauthorized, we permit Allstate's practices to continue provided its agents abide by the same standards of care as a practicing attorney, consistent with *Perkins* and *Cultum*. This means that the individual "practicing law" may continue such practice only if he or she abides by and upholds the same rules of professional conduct as members of the Washington State Bar Association. *See Batten v. Abrams*, 28 Wn. App. 737, 739 n.1, 626 P.2d 984 (1981) (nonlawyer who undertakes role of lawyer "assumes the duties and responsibilities [of a lawyer] and is accountable to the same standards of ethics and legal knowledge.").

■ The rule of professional conduct governing interactions with an unrepresented party states:

> In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.

RPC 4.3. Klein led the Joneses to believe that she had their best interests in mind while she simultaneously appeared disinterested in the ultimate outcome of the settlement.

The Joneses may have thought that Klein was representing them.[19] Ultimately, the Joneses perceived that Klein was helping them, Klein did not correct this misunderstanding, and they acted on her advice.

As the trial court found in its oral decision, Allstate had a stated goal of decreasing legal representation in the claims process:

> It is clear from the documents that are before me that reducing legal representation of claimants was one of the goals of the manner in which the claims adjustor was supposed to interface with the public, and so what better way to reduce the likelihood that a claimant would seek counsel but to offer someone who provided services strongly mimicking what an attorney would do, and that's what I believe occurred here.

OD at 49-50. It appears from Allstate documents reviewed by the trial court[20] that it had a goal of reducing attorney involvement to achieve a higher rate of return on settlement claims. The trial court stated in reference to Allstate's goals for claim redesign:

> One of those assumptions they wanted to redefine was an assumption that attorney representation on claims was inevitable and in some cases should be incurred. They wanted to change that goal, according to their documents, to create a realization that the way we approach claimants and develop relationships will significantly alter representation rates and contribute to lower severities.

*Id.* at 49. We have previously held that an escrow agent was practicing law where the buyer and seller had adverse interests and that the agent breached a duty of care when he failed "to inform plaintiffs of the advisability of obtaining legal representation." *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 590, 675 P.2d 193 (1983). The same principles from *Bowers* apply by analogy here.

---

[19] Klein told the Joneses that they would need to tell her if they hired an attorney. Klein referred to herself as their "claim representative." She answered their settlement questions and prepared forms for them. She also assisted them with matters related to the settlement.

[20] These documents have been sealed.

Allstate denies that Klein fell below a standard of care with respect to the release because it denies that Klein ever advised the Joneses to sign the release and check. Pet'r Allstate's Reply Br. at 15. Klein's words are not in dispute; her January 17, 1998 letter to the Joneses opens thus: "Thank you for your time today to discuss the settlement . . . . [E]nclosed are forms for the Release of this Claim. Please sign . . . and return to me in the enclosed envelope." Clerk's Papers (CP) at 245. Allstate contends that Klein's request to the Joneses to sign the release "merely conveyed the adjuster's administrative request that the signed release be returned to her for her records, should plaintiffs decide to accept the policy limits offer." Pet'r Allstate's Reply Br. at 15. We agree with the trial court that in the context of this relationship the letter contains more than an administrative request to return the release in the event of a decision to sign it; the letter from Allstate constitutes advice to accept the settlement offer and sign the release. Also a Post-it note attached to the release said, "Please sign and return to my attn. Thanks Christy." CP at 249. Because we hold Allstate's employees who select and complete legal instruments to the standard of care of a practicing attorney, we agree with the trial court that advice to sign the release falls below that standard.

■ Finally, in certain situations, Allstate employees who select and complete legal documents must disclose conflicts of interest. Where a claims adjuster represents or purports to represent both an insured and a third party claimant, the adjuster must fully disclose the material facts of the representation to the claimant, consistent with the rules of professional conduct pertaining to conflicts of interest. *See* RPC 1.7(b);[21] RPC 1.8(g); RPC 1.4(b). Specifically,

[21] A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) The lawyer reasonably believes the representation will not be adversely affected; and

[a] lawyer who is representing a client in a matter:

. . . .

**(g)** Shall not, while representing two or more clients, participate in making an aggregate settlement of the claims of or against the clients . . . unless each client consents after consultation, including disclosure of the existence and nature of all the claims or pleas involved and the participation of each person in the settlement.

RPC 1.8(g). Furthermore, a lawyer "shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." RPC 1.4(b). Here, the trial court found that the conduct of Allstate's claims adjuster could lead the reasonable person to believe that her relationship with them was not adversarial. OD at 50. We agree.[22] In a situation such as this, a claims adjuster would need to disclose the potential conflict of interest inherent in representing adverse interests.

Both Allstate and amicus National Association of Independent Insurers cite *Commonwealth v. Allstate Insurance Co.*, 729 A.2d 135 (Pa. Commw. Ct. 1999), in support of the proposition that Allstate was not engaged in the practice of law. Pet'r Allstate's Opening Br. at 24 n.12; Br. of Amicus Curiae, The National Association of Independent Insurers at 12-14. That case involved a claims handling procedure similar to the one here; in addition to the "Quality Service Pledge," Allstate distributed a letter titled, " 'Do I Need an Attorney?' " (not given to the Joneses). *Commonwealth*, 729 A.2d at 137. *Commonwealth* is distinguishable. In *Commonwealth*, the court dismissed the charge because there was no claim that Allstate was engaged in the practice of

---

(2) The client consents in writing after consultation and a full disclosure of the material facts (following authorization from the other client to make such a disclosure). When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

RPC 1.7(b).

[22] We are not determining that the Joneses were Allstate's client, but rather that given the lack of an adversarial posture and the inherent conflict of interest in the settlement process, a claims adjuster should disclose this potential conflict to the third party claimant.

law. *Id.* at 141. In *Commonwealth*, there were no allegations that Allstate gave legal advice to third party claimants to settle a claim; the complaint against Allstate on that count was based solely on the representations Allstate made in the distributed documents. *Id.* at 139.

Here, we hold that in the context of the relationship forged by the Allstate adjuster with the Joneses, in preparing and completing the release and settlement check and in advising the Joneses to sign them, Allstate's claims adjuster was engaged in the practice of law. Allstate's employees who prepare legal documents and give advice affecting legal rights should be held to the standard of care of practicing attorneys. Allstate's claims adjuster here fell below that standard when she advised the Joneses to sign the release, did not properly advise them that there were potential legal consequences in signing the release and check, or alternatively refer them to independent counsel, did not properly disclose to the Joneses that she had an interest which conflicted (was adversarial)[23] with theirs, and followed Allstate's policy of discouraging attorney involvement in the claims process.

### III

Jeremy France contends that the trial court committed probable error in granting the Joneses' summary judgment motion striking his affirmative defenses and in determining that there was no accord and satisfaction in the form of the Joneses' endorsement and deposit of the $25,000 settlement check. Jeremy France's Mot. for Discretionary Review at 11. France's accord and satisfaction claim rests on both statutory and common law bases.

■ France argues that the facts of this case meet the requirements of accord and satisfaction as set forth in article 3 of the Uniform Commercial Code, which has been

---

[23] The dissent fails to recognize that a person can have an adversarial interest, yet develop a nonadversarial relationship. Dissent at 316. In this case Klein had an interest that was adverse to the Joneses, yet led them to believe that she was acting on their behalf.

adopted by the Washington Legislature:[24]

> (a) If a person against whom a claim is asserted proves that (i) that person in good faith tendered an instrument to the claimant as full satisfaction of the claim, (ii) the amount of the claim was unliquidated or subject to a bona fide dispute, and (iii) the claimant obtained payment of the instrument, the following subsections apply.
>
> (b) Unless subsection (c) applies, the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim.

RCW 62A.3-311(a), (b). It does not appear, however, that France has met his burden of showing that the check was tendered in good faith as required by RCW 62A.3-311(a)(i). "Good faith" is defined in RCW 62A.3-103(4) as "honesty in fact and the observance of reasonable commercial standards of fair dealing." The Uniform Commercial Code comment on this code section gives as an example of a lack of good faith the routine printing of full satisfaction language on a business's checks:

> Another example of lack of good faith is found in the practice of some business debtors in routinely printing full satisfaction language on their check stocks so that all or a large part of the debts of the debtor are paid by checks bearing the full satisfaction language, whether or not there is any dispute with the creditor. Under such a practice the claimant cannot be sure whether a tender in full satisfaction is or is not being made. Use of a check on which full satisfaction language was affixed routinely pursuant to such a business practice may prevent an accord and satisfaction on the ground that the check was not tendered in good faith under subsection (a)(i).

U.C.C. § 3-311 cmt. 4. Evidence provided by Allstate and Christy Klein indicates that full satisfaction language routinely appeared on Allstate's settlement checks:

---

[24] Br. of Appellant Jeremy France at 12-13.

Q: Did you write in—type in the words, "final settlement of any and all claims arising from bodily injury caused by the accident on 11-21-97"?

[Klein]: I believe that is part of the computer-generated check system. I am not sure at this late date.

. . . .

Q: Did you read the wording, "Final settlement of any and all claims arising from bodily injury caused by the accident" before you sent the check to the Joneses?

[Klein]: I am not sure I read that particular one, but it would have been standard wording that they used in all of their checks.

CP at 278; Dep. of Christy A. Klein at 146. Allstate's position is that the check was "computer-generated" and that "Ms. Klein did not exercise any 'legal discretion' with regard to the preparation of the release or check." Pet'r Allstate's Opening Br. at 21-22. Any departure from the standard language would have involved the exercise of legal discretion, and Allstate denies any discretion was involved. It appears therefore that the computer generated check at issue in this case falls squarely within the example of lack of good faith provided by the Uniform Commercial Code commentary. Under RCW 62A.3-311(a) the person asserting accord and satisfaction bears the burden of proof. France fails to meet that burden. Even after considering the facts and inferences from the facts in a light most favorable to France, we find that evidence on the record shows that Allstate routinely printed full satisfaction language on its checks. Because the transaction does not meet the good faith requirement of RCW 62A.3-311(a)(i), France may not assert the affirmative defense of accord and satisfaction as set forth in RCW 62A.3-311.

■ Furthermore, Washington case law concerning accord and satisfaction does not support France. "When the defendant is a fiduciary, he must show the accord was 'an express agreement made upon full revelation.' " *St. Hilaire v. Food Servs. of Am.*, 82 Wn. App. 343, 353, 917 P.2d 1114 (1996) (quoting *Ward v. Richards & Rossano, Inc.*, 51 Wn.

App. 423, 429, 754 P.2d 120 (1988) (citing *Perez v. Pappas*, 98 Wn.2d 835, 844, 659 P.2d 475 (1983))). Here, the defendant, France, is not a fiduciary. However, France asserts his defense based upon accord and satisfaction arising out of an agreement made between a fiduciary, Allstate, and the Joneses. Under these circumstances, the defendant asserting the defense must show the accord was an express agreement made upon full revelation. France argues that there was full revelation, but makes no citation to the record to support the assertion. Reply Br. of Appellant Jeremy France at 3. On the contrary, Allstate's January 27, 1998 letter accompanying the settlement check states that the release form and check are for the release and settlement of Janet Jones' medical claims against Allstate. The letter does not mention the effect the signing of the release and depositing of the check would have upon other claims that the Joneses may have pursued. Considering the facts and inferences from the facts in a light most favorable to France, we find that the settlement check was not accepted upon full revelation and therefore that France may not assert a common law defense of the existence of an accord and satisfaction.

Allstate requests that this court dismiss the Joneses' remaining claims, those for bad faith and civil fraud and for violation of the Consumer Protection Act. Pet'r Allstate's Opening Br. at 35-41. The bad faith and civil fraud claims do not come within the scope of the Court of Appeals order of certification to this court. Neither Allstate nor France listed the consumer protection claim as an issue in their motions for discretionary review. Pursuant to RAP 2.4(a) appellate courts review those parts of the trial court decision designated in the notice for discretionary review. Therefore, we decline to consider these issues and remand their consideration to the trial court.

## CONCLUSION

Allstate's claims adjuster was engaged in the practice of law and, as such, shall be held to the standard of care of a

practicing attorney. Here, Allstate's claims adjuster's conduct fell below that standard when she advised the Joneses to sign a release of liabilities, did not properly advise the Joneses that there were potential legal consequences of signing a settlement check and a release of all claims or refer them to independent counsel, and did not fully disclose the conflict of interest she presented. Jeremy France has not shown that an accord and satisfaction was reached in good faith and with full revelation. We therefore affirm the trial court's grant of summary judgment and remand for consideration of the Joneses' bad faith and civil fraud claims and Consumer Protection Act claim against Allstate, for consideration of the Joneses' remaining claims against Allstate and the other parties, and for the awarding of damages.

SMITH, IRELAND, CHAMBERS, and OWENS, JJ., concur.

MADSEN, J. (dissenting) — In my view, the claims adjuster in this case owes a duty to the third party claimants, and that duty is straightforward: The claims adjuster should be required to explain that she is not acting as the third party claimants' attorney, and she should be required to advise the third party claimants that if they have any questions about the legal ramifications of the settlement transaction, they should consult with an attorney. Significantly, the duty owed here is to third parties in an adversarial position.

Unfortunately, the majority's analysis is apt to cause confusion in this area because it is unclear about whether the parties are adversarial and whether this makes any difference in the duty owed. The majority states in its first sentence that the claims adjuster developed a nonadversarial relationship with the third party claimants, but later it acknowledges that the claims adjuster's interest was adversarial to the third party claimants. Majority at 294. This uncertainty is reflected in the majority's incomplete explanation of the significance of this court's modification of *Bohn v. Cody*, 119 Wn.2d 357, 832 P.2d 71 (1992) by *Trask*

*v. Butler*, 123 Wn.2d 835, 872 P.2d 1080 (1994) as to whether a duty is owed in the first place, and the majority's incorrect application of *Trask* in this case. The majority also remands for a determination of damages although material questions of fact remain as to proximate cause. The majority fails to address an issue raised by Allstate, whether the trial court erred in granting summary judgment on the grounds that Allstate breached a fiduciary duty to the Joneses. In addition, the majority claims that it does not reach the question whether the claims adjuster's conduct here constituted the unauthorized practice of law. The majority is clearly authorizing the practice to continue, however, and thus its actual holding is, despite its disclaimer, that the claims adjuster's activity constitutes the authorized practice of law.

Finally, I am unwilling to accept that as a matter of law Allstate acted in bad faith when it tendered a settlement check containing language stating the check was in full satisfaction of the claims arising from the Jones/France automobile accident. Instead, I would hold that the trial court erred in granting summary judgment precluding Jeremy France's affirmative defense of release accord and satisfaction.

I would reverse the trial court's grant of partial summary judgment, and remand for further proceedings.

I

If this court is going to permit insurance claims adjusters to engage in activities constituting the practice of law, it is appropriate that the court require the claims adjusters to adhere to the standard of care of an attorney. This is particularly true because a claims adjuster may be perceived as representing the interests of the third party.

As the majority notes, the court has adopted a six-part inquiry for determining whether a duty is owed to a nonclient. The alteration by *Trask* of *Bohn*'s statement of the first part of the inquiry is especially important because

this modification reflects the rule that *usually* an attorney owes no duty to third party adversaries. In *Bohn*, the court held that an attorney who was acting on behalf of the borrower in a lending transaction had a duty to the lender. The attorney met with the unrepresented lender and advised her as to some, but not all, of the legal ramifications of the loan transaction. In determining that a duty of care to the lender existed, the court utilized the six-part inquiry that the majority quotes. Majority at 307. The first of the factors used in *Bohn* to evaluate whether a duty was owed to a nonclient was " 'the extent to which the transaction was intended to *affect* the plaintiff.' " *Bohn*, 119 Wn.2d at 365 (emphasis added) (quoting *Stangland v. Brock*, 109 Wn.2d 675, 680, 747 P.2d 464 (1987)). Given this formulation of the inquiry, the court in *Bohn* found a duty owed the client-borrower's lender, i.e., a duty to someone in a position adversarial to the client.

The holding in *Bohn*, with its analysis that can readily lead to a duty to a nonclient adversary, was short-lived. In *Trask*, as the majority notes, the court modified the analysis for determining when a duty to a third party is owed. Instead of an initial inquiry into the extent the transaction is intended to *affect* the third party, the court held that the threshold inquiry is "[t]he extent to which the transaction was intended to *benefit* the plaintiff." *Trask*, 123 Wn.2d at 843 (emphasis added). *Trask* thus significantly altered the analysis, and dictates that a duty will generally not be found to an adversarial third party. Only if, as a threshold inquiry, an intent to benefit the third party is found can a duty arise. Moreover, the court was quite explicit that the duty is not owed to incidental beneficiaries of the transaction—only to intended beneficiaries. *Id.* at 845.

The court explained that policy considerations militating against finding a duty are strongest where such a duty would detract from the attorney's obligations to his or her client by creating a risk of divided loyalties because of conflicts of interest or breaches of confidence. *Id.* at 844. The court noted that "in no instance has a court found

liability to a third party adversary." *Id.* (citing *Bowman v. John Doe*, 104 Wn.2d 181, 188-89, 704 P.2d 140 (1985)).[25]

Although the majority acknowledges that *Trask* modified *Bohn*, the majority then reverts to the *Bohn* analysis instead of adhering to *Trask*. The proper inquiry is whether the claims adjuster intended to *benefit* the Joneses. While the majority concludes such intent existed, it also states that the claims adjuster "acted with the intent to influence the Joneses' decisions." Majority at 307. Further, it says that the claims adjuster's "actions directly impacted the Joneses with the certainty that they could be harmed." *Id.* The majority thus includes in the analysis the question of the claims adjuster's intent to *affect* the Joneses—an inquiry this court abrogated in *Trask*. Thus, the majority revives an analysis that is likely to lead to frequent findings of duty owed in adversarial situations. As this court has recognized, a duty to an adversarial third party should be the rare exception, not the rule.

This case is, nevertheless, that rare exception. The claims adjuster's activity was intended to benefit the Joneses because she facilitated a settlement and sent a check for the full policy limits to them, although, objectively speaking, her primary obligation clearly ran to Allstate and its insured. I would conclude, therefore, that there was sufficient intended benefit to the Joneses to pass the threshold inquiry. The Joneses were clearly not incidental beneficiaries. Applying the remaining factors from *Trask*, I agree that a duty to the Joneses arose.

However, even though this is the exceptional case where a duty to a third party in an adversarial position is owed, that should not undercut the general rule underlying *Trask*'s modification of *Bohn*: generally a duty is not owed to

---

[25] *Trask* involved a question of duty owed by an attorney to a third party. The additional question here, of course, is whether the same analysis applies to laypersons engaging in activities that constitute the practice of law. Because laypersons practicing law are generally held to the same standards as attorneys, *Trask* states the appropriate test for whether a duty to a third party is owed by a layperson practicing law. *See Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 586-87, 675 P.2d 193 (1983).

a third party adversary. As explained, and it bears repeating, this court noted in *Trask* that policy considerations generally disfavor finding a duty to a nonclient where an adversarial relationship exists because finding a duty may detract from an attorney's obligation to his or her own client.

At this point, I return to the majority's confusion about the adversarial nature of the parties' relationship. Although the majority states in its opening that in this case the relationship was nonadversarial, the majority evidently means that statement in the sense that the claims adjuster was friendly and helpful, among other things. However, the question of whether a duty is owed, and the nature of the duty owed, should not turn in any degree on whether the claims adjuster is pleasant, courteous, and helpful. The relationship between the adjuster and the third party claimant is not rendered nonadversarial by such conduct, nor does it become adversarial in the event the adjuster is abrupt, mechanical, or hostile in demeanor. Indeed, the question here—involving the practice of law by adjusters, led to an agreement in 1938 between the American Bar Association (ABA) Committee on the Unauthorized Practice of Law and the Committee on Lay Adjusters of the Insurance Section of the ABA, in conference with a special committee representing various insurance interests, that laypersons have a role in adjusting insurance claims. 7 ERIC M. HOLMES, HOLMES' APPLEMAN ON INSURANCE 2D § 49:23, at 653 (2d ed. 1998). Among the comments set forth by the Conference Committee on Adjusters[26] is the following:

> "The Committee believes that anyone who has, or thinks he has, a claim against a company is entitled at all times to *courteous*, fair and just treatment from the representatives of that company."

---

[26] The name was later changed to the National Conference of Lawyers, Insurance Companies, and Adjusters by resolution adopted by the House of Delegates at a February 1961 meeting. 7 ERIC M. HOLMES, HOLMES' APPLEMAN ON INSURANCE 2D § 49:23, at 653 n.813 (2d ed. 1998).

*Id.* at 654 (emphasis added) (quoting Committee's statement). Not only is it appropriate for adjusters to act in a courteous manner, it is also good business practice, and this court should encourage it.

The adversarial nature of the relationship arises, instead, as a result of the adverse interests of the claims adjusters and the claimant. Here, the claims adjuster for Allstate, just as Allstate itself, owed its own insured a duty to act in the insured's interest. No representations of helpfulness, assistance, or holding oneself out as serving the third party claimant's interests can alter the fact that Allstate and the Joneses were legally and factually in an adversarial relationship.

Although this case involves the unusual situation where a duty is owed to an adversarial third party claimant, the analysis in *Trask* properly encompasses this result where its factors are satisfied. Significantly, finding a duty owed does not depend on whether the claims adjuster has created a "trust-based relationship," or held herself out as representing the third party claimant's interests. Nor is it necessary to assess whether the adjuster has been simply courteous, friendly, and helpful, or instead has gone so far as to conduct herself in a way that deceives the claimant into thinking she represents his or her interests.

The next question is what duty is owed. The claims adjuster and the claimant are, objectively in fact, in an adversarial position. For this reason, I question whether RPC 1.8(g) applies here. *See* majority at 311. That rule pertains to an attorney's representation of two or more clients in a settlement transaction. While, as noted, the transaction here can be said to benefit the Joneses in certain respects, and while the adjuster may have held herself out as representing the Joneses, the indisputable fact is that she did not represent them—she represented Allstate and its insured. Moreover, permitting the claims adjuster to disclose, as the rule requires, "the existence and nature of all the claims or pleas involved and the participation of each person in the settlement" would authorize

her to give legal advice that she is not qualified to give. RPC 1.8(g). The claims adjuster is not an attorney.

I would require the claims adjuster to explain that she is not acting as the claimant's attorney, and to advise the third party claimant that if he or she has any questions regarding the legal ramifications of the transaction, the claimant should consult an attorney. The court's analysis in *Bowers v. Transamerica Title Insurance Co.*, 100 Wn.2d 581, 675 P.2d 193 (1983), is, as the majority says, helpful by analogy. There, in connection with a sale of real property, a layperson selected and drafted an earnest money agreement, escrow instructions, a promissory note, a statutory warranty deed, and a modification of the promissory note. The seller was later unable to execute against the property sold upon the buyer's default because the escrow agent had prepared an unsecured promissory note.

The court concluded that the layperson acting as escrow agent engaged in the unauthorized practice of law, and was liable in negligence. *Id.* at 586-87. The court reasoned that "[t]he duties of an attorney practicing law are also the duties of one who without a license attempts to practice law." *Id.* at 587 (citing *Burien Motors, Inc. v. Balch*, 9 Wn. App. 573, 513 P.2d 582 (1973)). The court then reasoned that in the real estate transaction involved, the buyer's and seller's interests were adverse, and therefore an attorney who acted as escrow agent would be required to provide each client the opportunity to evaluate his or her need for representation free of any conflict and to obtain other counsel if desired. *Bowers*, 100 Wn.2d at 590 (citing former CPR EC 5-16 (Code of Professional Responsibility, Ethical Consideration 5-16)). Importantly, the court said that this duty would extend to each party and would not compromise the escrow agent's duty of impartiality. *Id.* The court held that the layperson breached this duty by failing to inform plaintiffs of the advisability of obtaining legal representation. *Id.*

Here, the claims adjuster is not in an impartial position, unlike the escrow agent in *Bowers*. However, the claims

adjuster's duty to her client must not be compromised, just as the escrow agent's impartiality in *Bowers* was not to be compromised. Accordingly, *Bowers* suggests that a duty to advise the third party claimant that the claims adjuster is not an attorney and that the claimant should consult an attorney if he or she has any questions about the legal ramifications of a transaction is appropriate in this case. Should the third party claimant retain an attorney, of course, WAC 284-30-330(19) would prevent the claims adjuster from negotiating or settling the claim without that attorney's knowledge and consent.

There appears to be no dispute here that the claims adjuster did not advise the Joneses to seek legal counsel if they had any questions about the legal effect of the documents. Accordingly, she breached the duty owed.

The majority also finds a breach of duty, but then incorrectly affirms the trial court's holdings that Allstate was liable as a matter of law and that the only remaining question on this negligence claim against Allstate is the amount of damages the Joneses suffered because of the breach. Majority at 295, 316 (remanding for consideration of other claims and awarding of damages). If the duty breached is the duty to advise of the need for independent counsel if there are any questions about the legal effect of signing the settlement check or release, as I propose and the majority advances as an alternate duty owed, summary judgment on liability is improper. Summary judgment in favor of the Joneses is appropriate only if, considering all the facts and reasonable inferences therefrom in the light most favorable to Allstate as the nonmoving party, there are no genuine issues of disputed material fact and the Joneses are entitled to judgment as a matter of law. *See* CR 56(c); *Bulman v. Safeway, Inc.*, 144 Wn.2d 335, 351, 27 P.3d 1172 (2001). There is a material issue of fact respecting proximate causation. As Allstate points out, there is evidence that the Joneses consulted two attorneys before Mrs. Jones signed the check and it was deposited in their account. In addition, Mr. Jones testified that he "didn't have a belief or

an understanding that [the adjuster] was going to represent [him] as an attorney," that he did not ask her to do legal work for him, and that he did not expect her to give him legal advice. Terry Jones Dep. at 183-84, 186-87; CP at 583-86. Mrs. Jones testified that she understood that Allstate and its adjuster acted as the Frances' insurance company and that both Allstate and its insured were adversaries in a dispute with her. Janet Jones Dep. at 92-93; CP at 507-08. Given this evidence, there is a disputed question of material fact as to whether the claims adjuster's failure to advise the Joneses to seek advice from other counsel as to the legal effect of the transaction proximately caused any loss they suffered as a result of Mrs. Jones signing the settlement check.

Even under the majority's analysis, the same question of material fact exists, i.e., whether any damages were proximately caused by the claims adjuster's breach of duties given the Joneses' meetings with two attorneys and the Joneses' knowledge and understanding of the relationship between themselves and the claims adjuster, and of her role. Thus, insofar as the negligence claim is concerned, remand on damages alone is inappropriate even if one agrees with the duties imposed by the majority.

The majority also neglects to address an issue raised by Allstate. Allstate challenges the trial court's summary judgment ruling that Allstate breached fiduciary duties to the Joneses in representing the Joneses on their claims against the Frances. I would hold that the trial court's summary judgment ruling on this point must be reversed. Initially, there was no attorney-client relationship between the adjuster and the Joneses, and a fiduciary obligation cannot be based on such a relationship. Second, an insurer does not owe a true fiduciary duty to its own insured, and I would hold no such duty ordinarily exists as to a third party claimant. Even if a fiduciary relationship might otherwise arise in fact, rather than as a matter of law, *see Liebergesell v. Evans*, 93 Wn.2d 881, 890, 613 P.2d 1170 (1980), the trial court erred in granting summary judgment on this issue.

There may be a question here as to whether the claims adjuster led the Joneses to believe she was representing their interests, or whether they reasonably perceived that she was, but, objectively speaking, there is no question that she was representing Allstate and its insured. She was in an adversarial position to the Joneses. The Joneses' deposition testimony tends to show that they clearly knew this to be the case. Accordingly, there is at the least a disputed question of material fact as to whether any fiduciary relationship existed in fact.

Finally, while the majority purports to leave open the question whether the claims adjuster engaged in the unauthorized practice of law, it has implicitly found the practice to be authorized. The majority expressly decides "to permit the [claims adjusters'] activities to continue provided the adjusters comply with the standard of care of a practicing attorney." Majority at 305.

## II

I also disagree with the majority's conclusion that Allstate acted in bad faith as a matter of law by tendering the check stating, "FINAL SETTLEMENT OF ANY AND ALL CLAIMS ARISING FROM BODILY INJURY CAUSED BY ACCIDENT ON 11/21/97." CP at 245. As noted by the majority, article 3 of the Uniform Commercial Code, RCW 62A.3-311, provides for accord and satisfaction:

(a) If a person against whom a claim is asserted proves that (i) that person in good faith tendered an instrument to the claimant as full satisfaction of the claim, (ii) the amount of the claim was unliquidated or subject to a bona fide dispute, and (iii) the claimant obtained payment of the instrument, the following subsections apply.

(b) Unless subsection (c) applies, the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim.

A requirement under this section is that the instrument be tendered in "good faith," which is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." RCW 62A.3-103(4). An example of the lack of good faith is given in the U.C.C. Comments and quoted by the majority:

> "Another example of lack of good faith is found in the practice of some business debtors in routinely printing full satisfaction language on their check stocks so that all or a large part of the debts of the debtor are paid by checks bearing the full satisfaction language, whether or not there is any dispute with the creditor. Under such a practice the claimant cannot be sure whether a tender in full satisfaction is or is not being made. Use of a check on which full satisfaction language was affixed routinely pursuant to such a business practice may prevent an accord and satisfaction on the ground that the check was not tendered in good faith under subsection (a)(i)."

Majority at 313 (quoting U.C.C. § 3-311 cmt. 4). The majority concludes that the computer generated check at issue in this case "falls squarely" within this example. I disagree.

First, Allstate was not a regular business debtor. Allstate settles claims for its insured.

Second, in the example given immediately preceding the majority's quoted section, the comment states:

> The meaning of "fair dealing" will depend upon the facts in the particular case. For example, suppose an insurer tenders a check in settlement of a claim for personal injury in an accident clearly covered by the insurance policy. The claimant is necessitous and the amount of the check is very small in relationship to the extent of the injury and the amount recoverable under the policy. If the trier of fact determines that the insurer was taking unfair advantage of the claimant, an accord and satisfaction would not result from payment of the check because of the absence of good faith by the insurer in making the tender.

U.C.C. § 3-311 cmt. 4.

In this case, unlike the example I quote above, Allstate sent the Joneses a check for the full policy limit of France's

policy. It is also not surprising that in sending out this final settlement check Allstate included language of accord and satisfaction in order to effect a release of its insured, Mr. France. Under the particular facts of this case, and because the only issue before this court is whether Mr. France can assert the defense of accord and satisfaction, I would hold that the trial court erred in granting summary judgment on the issue of bad faith by Allstate.

The majority further asserts that accord and satisfaction is inapplicable because Allstate is a "fiduciary," and thus Allstate must show that the agreement was made upon full revelation. Majority at 315. This conclusion stems from a fundamental misunderstanding regarding the nature of a fiduciary relationship in the insurance context. Initially, this court has made it clear that an insurer is not a true fiduciary even to its insured. Rather, an insurer's duty is one of good faith. " '[A]n insurer must deal fairly with an insured, giving equal consideration *in all matters* to the insured's interests.' " *Van Noy v. State Farm Mut. Auto. Ins. Co.*, 142 Wn.2d 784, 794, 16 P.3d 574 (2001) (quoting *Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 386, 715 P.2d 1133 (1986)). More obviously, in this case Allstate's only duty is to its insured, Jeremy France. It owes no insurer's duty of good faith to the Joneses. *See Tank*, 105 Wn.2d at 393-94; *Van Noy*, 142 Wn.2d at 792-94 (detailing the nature of the quasi-fiduciary obligation an insurance company owes to its insured). Therefore, the rules regarding fiduciaries in the accord and satisfaction context are inapplicable to this case.

For the reasons stated, I dissent.

ALEXANDER, C.J., and JOHNSON and SANDERS, JJ., concur with MADSEN, J.

Motions for reconsideration denied November 5, 2002.