[No. 50403–2.   En Banc.   January 11, 1985.]

DIANE CULTUM, *Respondent,* v. HERITAGE HOUSE
REALTORS, INC., *Appellant.*

*Sax & MacIver,* by *James P. Donohue* and *Scott J. Borth,* for appellant.

*Henry M. Aronson, David Curtis,* and *Elizabeth A. Greathouse,* for respondent.

*Robert T. Farrell* and *David D. Hoff* on behalf of Washington State Bar Association and *William D. North, Laurene K. Janik, Thomas L. Fishburne,* and *James E. Horne* on behalf of National Association of Realtors, amici curiae for appellant.

*Ralph Paul Teller,* amicus curiae for respondent.

PEARSON, J.—At issue in this appeal is whether the completion by a real estate salesperson of a form earnest money agreement containing a contingency clause constitutes the unauthorized practice of law in violation of RCW 2.48.170–.190.

In deciding this issue, the trial court found that this conduct did constitute the unauthorized practice of law and was a per se violation of the Consumer Protection Act, RCW 19.86, warranting damages, attorney fees and injunctive relief. As a consequence, the trial court permanently enjoined defendant, Heritage House Realtors, Inc. (Heritage), from completing, filling in the blanks, or otherwise preparing any clause with respect to any real estate purchase or sale agreement, earnest money agreement, addenda thereto, or any other document intended to create or define contractual rights or obligations in connection with any real estate transaction. In addition, plaintiff,

Diane Cultum, was awarded damages of $178.65, representing the interest lost during the time Heritage retained the earnest money. Cultum was also awarded attorney fees and costs in excess of $32,000 under the Consumer Protection Act. RCW 19.86.090. We now reverse the decision of the trial court that defendant's actions constituted the unauthorized practice of law, dissolve the injunction, and remand for a determination of contractual attorney fees.

The salient facts are as follows. In 1980 Cultum contacted Heritage in response to an advertisement in the Seattle Times and was put in touch with Yvonne Ramey, a real estate agent for Heritage. After viewing several homes, Ramey showed Cultum the home of Arthur and Paula Smith. Cultum decided to make an offer on the Smith home but was concerned that there might be something wrong with the house. Cultum therefore told Ramey that she wanted to have the house inspected and be able to withdraw her offer on the basis of that inspection.

Thereafter Ramey prepared a real estate purchase and sale agreement (earnest money agreement) setting forth Cultum's offer to purchase the Smith home. This agreement and all other subsequent agreements contained an attorney fee clause which provided that

> [i]n the event that either the Buyer, Seller, or Agent, shall institute suit to enforce any rights hereunder, the successful party shall be entitled to court costs and a reasonable attorney's fee.

All agreements were prepared on standardized forms drafted by attorneys. Cultum's offer and a subsequent offer were both rejected. About a month later, Ramey and Cultum resubmitted the earnest money agreement with an addendum which raised the purchase price. Cultum later discovered that the agreement did not contain a structural inspection contingency clause and asked Ramey to prepare a second addendum. This addendum provided: "This offer is contingent on a Satisfactory Structural Inspection, To be completed by Aug 20, 1980." Both addenda were on forms drafted by an attorney. Ramey merely inserted the desired

modifications in a blank space. Ramey did not select the form since her employer used a single standard form.

The Smiths accepted this last offer and Heritage deposited Cultum's $3,000 earnest money into a noninterest–bearing trust account. Thereafter, Cultum received a report on the house from Northwest Inspection Engineers. The report noted missing siding and caulking on exterior portions of the home, damage to the siding along one corner of the north entry door, deterioration on the roof which probably caused some leakage, inadequate support on a sheet of plywood on the roof of the new addition causing some softness in the roof, rusted gutters, soft mortar on the chimney, and evidence of minor roof leakage along the living room entry. The inspector found no major problems in the plumbing, heating or electrical systems.

Cultum found the report unsatisfactory and demanded return of her earnest money. Ramey immediately prepared a rescission agreement but the Smiths refused to sign it. The Smiths claimed there was nothing structurally wrong with the house and Cultum was acting in bad faith. The Smiths argued that the language of the inspection contingency meant that the report had to be truly unsatisfactory and reveal real structural defects based upon an objective standard. They therefore threatened to sue Heritage if it returned Cultum's money.

Heritage initially gave Cultum three options: It could continue to hold the money in a noninterest–bearing account pending an agreement between Cultum and the Smiths; it could pay the money into a registry of the court; or, it could refund the money to Cultum in exchange for her agreement to indemnify Heritage in an action brought by the Smiths. Subsequently, Heritage also offered to place the money in an interest–bearing account pending resolution of the dispute.

Because these options were each substantially less than Cultum had believed the agreement would provide her, she refused to accept them and hired an attorney. Six months later Heritage refunded Cultum's earnest money.

Cultum then filed this action against Heritage seeking damages for loss of the use of her money during the period Heritage held it. She also requested a permanent injunction restraining Heritage from engaging in the unauthorized practice of law. In addition, she sought attorney fees under the Consumer Protection Act, RCW 19.86.090.

I

The holding of the trial court was not surprising. In a series of recent cases this court has broadly defined the practice of law to include

> the selection and completion of form legal documents, or the drafting of such documents, including deeds, mortgages, deeds of trust, promissory notes and agreements modifying these documents . . .

*Bowers v. Transamerica Title Ins. Co.,* 100 Wn.2d 581, 586, 675 P.2d 193 (1983) (quoting *Washington State Bar Ass'n v. Great W. Union Fed. Sav. & Loan Ass'n,* 91 Wn.2d 48, 55, 586 P.2d 870 (1978)); *Hagan & Van Camp., P.S. v. Kassler Escrow, Inc.,* 96 Wn.2d 443, 635 P.2d 730 (1981).

The trial court's extension of these holdings to completion of form earnest money agreements by real estate salespersons is logical since such agreements fix the legal rights and duties of both buyers and sellers of residential real estate. It therefore fits within the broad definition of the practice of law as we have previously defined it.

Nevertheless, without retreating from our rulings in those three recent cases, we think there are sound and practical reasons why some activities which fall within the broad definition of "the practice of law" should not be unauthorized simply because they are done by lay persons.

As we have so often stated, it is the duty of this court to protect the public from the activity of those who, because of the lack of professional skills, may cause injury whether they are members of the bar or persons never qualified for or admitted to the bar. *Great Western,* at 60. We have also made it clear that the practice of law is within the sole province of the judiciary and encroachment by the

Legislature may violate the separation of powers doctrine. *Hagan,* at 453. This does not mean, however, that the attorney hegemony over the practice of law must be absolute. Hence, although the completion of form earnest money agreements might be commonly understood as the practice of law, we believe it is in the public interest to permit licensed real estate brokers or licensed salespersons to complete such lawyer prepared standard form agreements provided that, in doing so, they comply with the standard of care demanded of an attorney.

For a long time suppression of the practice of law by nonlawyers has been proclaimed to be in the public interest, a necessary protection against incompetence, divided loyalties, and other evils. It is now clear, however, as several other courts have concluded, that there are other important interests involved. *See Conway–Bogue Realty Inv. Co. v. Denver Bar Ass'n,* 135 Colo. 398, 312 P.2d 998 (1957). These interests include:

1. The ready availability of legal services.

2. Using the full range of services that other professions and businesses can provide.

3. Limiting costs.

4. Public convenience.

5. Allowing licensed brokers and salespersons to participate in an activity in which they have special training and expertise.

6. The interest of brokers and salespersons in drafting form earnest money agreements which are incidental and necessary to the main business of brokers and salespersons.

We no longer believe that the supposed benefits to the public from the lawyers' monopoly on performing legal services justifies limiting the public's freedom of choice. The public has the right to use the full range of services that brokers and salespersons can provide. Christensen, *The Unauthorized Practice of Law: Do Good Fences Really Make Good Neighbors—or Even Good Sense?,* 1980 Am. B. Found. Research J. 159. The fact that brokers and salespersons will complete these forms at no extra charge,

whereas attorneys would charge an additional fee, weighs heavily toward allowing this choice.

Another important consideration is the fact that the drafting of form earnest money agreements is incidental to the main business of real estate brokers and salespersons. WAC 308–124D–020. These individuals are specially trained to provide buyers and sellers with competent and efficient assistance in purchasing or selling a home. *See* WAC 308–124H. Because the selection and filling in of standard simple forms by brokers and salespersons is an incidental service, it normally must be rendered before such individuals can receive their commissions. Clearly the advantages, if any, to be derived by enjoining brokers and salespersons from completing earnest money agreements are outweighed by the fact that such conveyances are part of the everyday business of the realtor and necessary to the effective completion of such business. *See Cowern v. Nelson,* 207 Minn. 642, 290 N.W. 795 (1940). *See also* 53 A.L.R.2d 788, § 3 (Supp. 1978).

The interest in protecting the public must also be balanced against the inconveniences caused by enjoining licensed brokers and salespersons from completing form earnest money agreements. *State ex rel. Reynolds v. Dinger,* 14 Wis. 2d 193, 109 N.W.2d 685 (1961). Although lawyers are also competent to handle these transactions, lawyers may not always be available at the odd hours that these transactions tend to take place. As noted by the Minnesota Supreme Court:

> It is the duty of this court so to regulate the practice of law and to restrain such practice by laymen in a common–sense way in order to protect primarily the interest of the public and not to hamper and burden such interest with impractical technical restraints no matter how well supported such restraint may be from the standpoint of pure logic. . . . We do not think the possible harm which might come to the public from the rare instances of defective conveyances in such transactions is sufficient to outweigh the great public inconvenience which would

follow if it were necessary to call in a lawyer to draft these simple instruments.

*Cowern,* at 647.

In a few instances earnest money agreements may be complicated and one or both parties may realize the need for a lawyer to prepare the contract rather than use a standardized form. In fact, if a broker or salesperson believes there may be complicated legal issues involved, he or she should persuade the parties to seek legal advice. More often, however, these transactions are simple enough so that standardized forms will suffice and the parties will wish to avoid further delay or expense by using them. *See* Comment, *The Unauthorized Practice of Law by Laymen and Lay Associations,* 54 Calif. L. Rev. 1331 (1966). *See also New Jersey State Bar Ass'n v. New Jersey Ass'n of Realtor Bds.,* 186 N.J. Super. 391, 452 A.2d 1323 (1982).

It should be emphasized that the holding in this case is limited in scope. Our decision provides that a real estate broker or salesperson is permitted to complete simple printed standardized real estate forms, which forms must be approved by a lawyer, it being understood that these forms shall not be used for other than simple real estate transactions which arise in the usual course of the broker's business and that such forms will be used only in connection with real estate transactions actually handled by such broker or salesperson as a broker or salesperson and then without charge for the simple service of completing the forms.

■ This conclusion is not inconsistent with the state bar act, RCW 2.48. Among the inherent powers of the judicial branch is the power to admit to practice, and necessarily therefrom the power to disbar from practice, attorneys at law. *State ex rel. Laughlin v. Washington State Bar Ass'n,* 26 Wn.2d 914, 917, 176 P.2d 301 (1947). This court has repeatedly emphasized that this power to regulate the practice of law lies within the sole jurisdiction of the courts. *Hagan & Van Camp, P.S. v. Kassler Escrow, Inc.,* 96 Wn.2d 443, 635 P.2d 730 (1981); *State ex rel. Schwab v.*

*Washington State Bar Ass'n,* 80 Wn.2d 266, 493 P.2d 1237 (1972); *Washington State Bar Ass'n v. Washington Ass'n of Realtors,* 41 Wn.2d 697, 251 P.2d 619 (1952). RCW 2.48 was adopted in the interest of uniformity of standards and to remedy and prevent mischief in the profession. It did not restrict or take away any of the courts' power. *State ex rel. Laughlin,* at 917.

In light of the courts' inherent power to regulate the practice of law, we believe it is totally within our power to allow brokers and salespersons to practice law within the narrow confines that our holding allows, irrespective of what the statutory language in RCW 2.48 might suggest.

## II

Our decision to allow licensed brokers and salespersons to complete form earnest money agreements is based on the practical needs and interests of the public. The completion of a form earnest money agreement is in most instances less technical and more straightforward than closing a real estate transaction. This is not to say, however, that there is no possibility of injurious consequences from the acts of lay persons. The public still needs protection against incompetence, divided loyalties and other evils. RCW 18.85 controls the licensing of real estate brokers and salespersons. The statute provides some preliminary protection by dictating certain conditions and qualifications with which a person must comply prior to being licensed. However, as the court stated in *Hagan,* the fact that lay persons must comply with licensing requirements does not offer sufficient protection to the public. *Hagan,* 96 Wn.2d at 448-49. Therefore, we hold that licensed real estate brokers and salespersons, when completing form earnest money agreements, must comply with the standard of care of a practicing attorney. *See Bowers v. Transamerica Title Ins. Co.,* 100 Wn.2d 581, 675 P.2d 193 (1983); *Mattieligh v. Poe,* 57 Wn.2d 203, 356 P.2d 328, 94 A.L.R.2d 464 (1960); *Hecomovich v. Nielsen,* 10 Wn. App. 563, 518 P.2d 1081 (1974); *Andersen v. Northwest Bonded Escrows, Inc.,* 4 Wn. App. 754, 484 P.2d

488 (1971).

The trial court awarded Cultum damages based on a finding that the contingency clause as written by Ramey violated the standard of care of a practicing attorney. Whether or not the contingency clause as written by Ramey meets an attorney's standard of care, Ramey is nonetheless liable because the problems in this case were caused by Ramey's failure to follow her client's explicit instructions. This dispute arose because Cultum and the Smiths disagreed on whether the defects noted in the inspection report were sufficient enough to cause the real estate contract to fail. Cultum had wanted her offer conditioned on her subjective approval of the inspection. Ramey, contrary to Cultum's wishes, failed to include a subjective right in the contingency clause. If Ramey had complied with Cultum's request, the dispute with the Smiths could not have arisen and Cultum's earnest money would have been refunded to her immediately.

■ It is the duty of an agent to obey all reasonable instructions and directions given by the principal and to adhere faithfully to them in all cases where they ought properly to be applied and in which they can be obeyed by the exercise of reasonable and diligent care. 3 Am. Jur. 2d *Agency* § 206 (1962).

An attorney is liable for all losses caused by his or her failure to follow the explicit instructions of the client. *Olfe v. Gordon,* 93 Wis. 2d 173, 286 N.W.2d 573 (1980); 7A C.J.S. *Attorney and Client* § 236 (1980). When a broker undertakes to practice law and prepares a contract at variance with the client's instructions, he or she is liable for negligence. *Mattieligh,* 57 Wn.2d at 204. Therefore, because Ramey was practicing law and failed to comply with Cultum's wishes she is liable for all damages proximately caused by her negligence. It is irrelevant whether the language in the contingency clause may have somehow been improper.

## III

█ The trial court awarded Cultum damages of $178.65 representing the interest lost during the time that Heritage retained her earnest money. If a real estate broker fails to exercise reasonable care and skill, the real estate broker is liable to the client for damages resulting from such failure. *Mattieligh,* at 205. Based on this rule and our conclusion that Ramey failed to exercise the reasonable care and skill of a practicing attorney, we affirm the trial court's award of damages, including the amount, because it is within the range of relevant testimony and therefore will not be disturbed on appeal.[1] *Ferrell v. Cronrath,* 67 Wn.2d 642, 409 P.2d 472 (1965).

## IV

The final issue before us is the award of attorney fees. The trial court determined that Heritage and its agent, Ramey, had violated the Consumer Protection Act, RCW 19.86, and that therefore Cultum was entitled to attorney fees pursuant to the formula articulated by this court in *Bowers v. Transamerica Title Ins. Co., supra.* Unlike the trial court, however, we have concluded that Ramey's conduct did not constitute the unauthorized practice of law. Hence, there is no violation of the Consumer Protection Act and Cultum is not entitled to the attorney fees awarded by the trial judge. However, the earnest money agreement drafted by Ramey specifies that:

> In the event that either the Buyer, Seller, or Agent, shall institute suit to enforce any rights hereunder, the successful party shall be entitled to court costs and a reasonable attorney's fee.

In light of this provision, we remand for further proceedings to determine whether Cultum is entitled to contractual

---

[1]Heritage argues that the rate of interest used by the trial judge should have been 6 percent as authorized at the time by RCW 19.52.010. This statute only applies to loans or forbearance of money, goods or things in action. The statute is inapplicable to earnest money agreements which are neither loans nor a forbearance of money, goods or things in action.

attorney fees. We dissolve the injunction.

WILLIAMS, C.J., and DOLLIVER and DIMMICK, JJ., concur.

BRACHTENBACH, J. (concurring)—While I concur in the result, I disagree with much of the majority's rationale.

My starting premises are: (1) there is no such thing as a "simple" earnest money agreement; (2) the fact that it is printed or "standardized" is not relevant; (3) the fact that the form has been approved by a lawyer is not relevant—it is the tailoring of the form to a particular transaction which is critical; (4) the fact that the form is completed incidental to other services of the broker offers no protection to the public; and (5) the fact that the agreement is completed without charge is irrelevant.

A binding earnest money agreement is the document which firmly fixes the rights and liabilities of the parties. A typical form establishes the nature of the title which the seller must convey and the type of conveyance to be made, both of which the buyer must accept. It provides for the respective liabilities of various items by proration at closing. It specifies the nature of the title insurance to be furnished, usually by the seller. I doubt that many buyers know what a preliminary commitment for a standard form purchaser's policy of title insurance is or what alternative types of coverage are available.

The earnest money agreement, if it is a sale on contract, designates the form of the contract including all the terms by which seller and buyer shall be bound. It may attempt to eliminate all representations about very material matters unless contained in the agreement. It sets conditions of default including alternative remedies therefor. It may impose attorney fee liability which might not otherwise exist. It establishes the date of possession, but not whether the date refers to legal or physical possession. This hardly appears to be a "simple" document. I fail to perceive how the complexity of this document is lessened because it is printed.

That the form was initially prepared or approved by a lawyer will hopefully minimize the potential for disputes, *i.e.*, the competent lawyer should have anticipated and provided for those events which most frequently occur in real estate transactions.

However, despite lawyer preparation of the forms, there are two problems. First, the form itself may contain provisions which are inadequate or inappropriate *to a particular* transaction, or such terms may be omitted entirely. Second, "filling in the blanks" requires at least minimal skill in drafting language as part of a binding document set in the framework of a vast array of statutory law and common precedents.

The earnest money agreement in this case illustrates the hazards of "filling in" the "simple" form. One provided, in part, that the agreement was conditioned on "inspection of plumbing and electrical systems, paid for by purchaser and inspection of heating system." The questions are immediately apparent. Who pays for the inspection of the heating system in view of the way the condition is expressed? Inspection by whom? A qualified plumber, electrician, a general contractor, a city inspector? Is it merely the fact of inspection which satisfies the condition? Must the inspection disclose conditions which are satisfactory to this buyer or to a reasonable, objective buyer? If the inspection discloses a minor defect which can be quickly remedied, does the seller have the option to so remedy? If inspection discloses a major defect, can the seller remedy? Must the corrected system also be inspected to the satisfaction of the buyer?

That an earnest money agreement is prepared incidental to the licensed services of a broker is of little consolation to the parties if it is not properly prepared to reflect the intent of the parties. That it is prepared without separate charge has no bearing on whether its preparation constitutes the practice of law.

I am not naive enough to believe that it is feasible for every earnest money agreement to be drafted anew and

tailored to fit a particular transaction. Residential transactions particularly would grind to a halt. Buying and selling real estate, especially residential real estate, realistically cannot be done at the convenience of lawyers' office hours.

I would reach the same result as the majority by forthrightly recognizing that requiring lawyer preparation of every earnest money agreement is not a practicable alternative to the broker/salesperson preparation which works reasonably well in most instances. I would accept the current practice as a fact of life in the real world. The ultimate protection to the public is the requirement that the broker/salesperson be held to the standard of care of a practicing lawyer. The competent broker/salesperson should recognize when special circumstances require more skilled and knowledgeable drafting. If that decision is made at their peril, hopefully it will be made carefully, keeping in mind the fiduciary relationship and the requirements of the licensing statute.

For the above reasons, I concur in the result but not the rationale of the majority.

UTTER, DORE, and ANDERSEN, JJ., concur with BRACHTENBACH, J.

Reconsideration denied March 28, 1985.