# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| LINCOLN AND JUDITH DAVID, | ) | No. 70525-3-I |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD G. NORD, GENE BRYSON, | ) | UNPUBLISHED OPINION |
| GEORGEAN MADDY, | ) | |
| | ) | FILED: July 7, 2014 |
| Respondents. | ) | |

VERELLEN, A.C.J. — A claim of unauthorized practice of law requires evidence of a breach of the standard of care. Judith and Lincoln David allege that when they purchased a condominium unit, listing agent Georgean Maddy and her broker Gene Bryson gave them incorrect legal advice regarding age restrictions under the federal Fair Housing Act (FHA)[1] and the condominium's restrictive covenants. They also allege that Maddy and Bryson failed to disclose potential conflicts of interest or advise the Davids to seek independent counsel. But in opposing summary judgment, the Davids provided no evidence that the information Maddy and Bryson relayed was incorrect or that they otherwise violated the applicable standard of care. Additionally, the Davids' own agent prepared their offer to purchase the condominium, including a merger clause expressly disclaiming any reliance on representations outside the agreement and the public offering statement. The Davids fail to establish any genuine issue of material fact.

---

[1] 42 U.S.C. §§ 3601-3631.

The trial court also properly dismissed the Davids' negligent misrepresentation claims for lack of any genuine issue of material fact. The Davids did not sue the corporation that developed the project and failed to establish any viable claim against the individual who owned the corporation. The Davids' other arguments are not persuasive.

We affirm the trial court's summary judgment dismissal of this lawsuit.

## FACTS

The Davids sought to purchase a condominium unit in the newly-built Norwood Glen complex. The Davids were represented by Brad Jessup, a real estate agent with the Windermere Real Estate of Arlington brokerage. Norwood Glen was represented by listing agent Georgean Maddy, also with the Windermere/Arlington brokerage. Gene Bryson owns and is the designated broker for Windermere/Arlington. Richard Nord owns Nord Northwest Corporation, the development company that built and offered Norwood Glen.

Because the Davids intended to rent out the condominium, they were concerned about use restrictions concerning the age of residents.[2] These include the following restrictive covenant, recorded May 2, 2005:

---

[2] Restrictive covenants and the condominium declaration are recognized mechanisms for limiting use rights of condominium property based on age. See generally 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE; REAL ESTATE: TRANSACTIONS §§ 12.4, at 29 & 12.9, at 48-49 (2d ed. 2004). The condominium, managed by a homeowners association, had the power to enforce those restrictions. Generally, "[t]o the extent the purchaser of a condominium unit can predict which procedures will work advantageously or detrimentally to himself, he needs to examine the association's control mechanisms in the declaration and bylaws." 18 STOEBUCK & WEAVER, § 12.10, at 51.

2.1 <u>Use of Project.</u> The Project is intended to be and shall be operated as "Housing for Older Persons" pursuant to the federal Fair Housing Act Amendments of 1988, 42 U.S.C. § 3607(b)(2)(C) and implementing regulations thereof.

2.2 <u>Residents of Project.</u> No person may be a resident of the Project, except as expressly authorized by this Article 2.

2.2.1 <u>Residents.</u> Except as authorized in Section 2.2.2 below, the residents of the Project will be *restricted solely to Adults* [defined to mean "*a person who is 55 years of age or older,* residing in a Unit" by section 1.1] and spouses/companions or caregivers of Adult Persons. A person is deemed to be a resident of the Project if that person remains overnight or sleeps in a Unit.

2.2.2 <u>Temporary Guests.</u> Visits by nonresidents shall not exceed thirty (30) nights in any six (6) month period.

. . . .

3.1 <u>School Impact Fee.</u> A school impact fee shall be paid on a Unit in the manner and amount specified by the City of Arlington school impact fee ordinance in effect at the time the interest in such Unit of the Project is conveyed or occupied by any person not complying with the restrictions set forth in Article 2 above.[3]

The condominium declaration, recorded May 30, 2006, also set forth the following

covenants:

17.1 <u>Use of Project.</u> The Project is intended to be and shall only be operated as "Housing for Older Persons" pursuant to the Federal Fair Housing Act Amendments of 1988, 42 U.S.C. § 3607(b)(2)(C) and implementing regulations thereof and as further defined in the Arlington code Chapter 20.90 Part II School Impact Fees. *This Development must have at least eighty percent (80%) of its Units inhabited by at least one person 55 years or older.*

17.2 <u>Residents of Project.</u> No person may be a Resident of the Project except as expressly authorized in this Article 17 and Section 17.2.1 below, <u>the residents of the Project will be restricted solely to Adults</u> ["Adult" is not defined in the Declaration, unlike the Restrictive Covenant filed with the county, above] and spouses/companions or caregivers of

---

[3] Clerk's Papers at 43-44 (emphasis added).

Adult Persons. A person is deemed to be a resident of the Project if that person remains overnight or sleeps in a unit.

17.2.1 Temporary Guests. Visits by nonresidents shall not exceed thirty (30) nights in any six (6) month period.

. . . .

17.4 School Impact Fee. A school impact fee shall be paid on a Unit in the manner and amount specified by the City of Arlington school impact fee ordinance in effect at the time the interest in such Unit of the Project is conveyed or occupied by any person not complying with the restrictions set forth in Article 17 of the Declaration.[4]

The public offering statement contained the following language:

The project is intended to be and shall only be operated as "Housing for Older Persons" pursuant to the Federal Fair Housing Act Amendments of 1988, 42 U.S.C. [§] 3607(b)(2)(C) and implementing regulations thereof and as further defined in the Arlington code Chapter 20.90 Part II. *This development must have at least eighty percent of its occupied Units inhabited by at least one person 55 years or older.* See Article 17, Restrictive Covenants, of the Declaration for further details.[5]

Because of their interest in renting the unit potentially to families with children, David met with listing agent Maddy to discuss the covenants. He described their initial meeting:

In that meeting with Ms. Maddy, she specifically explained to me that 42 U.S.C. 3607 (b)(2)(C) allowed for 20% of the units to have children, while 80% could not. As I wanted to make sure, I asked her to check with her broker to make sure that her interpretation of the statute and the application of the restrictive covenant contained in the Public Offering Statement was correct.[6]

Maddy described the interaction similarly:

[B]ased on what we were understanding at the time, that 20 percent of the unit[s] could be owned by people under 55, and if they were, you know,

---

[4] Id. at 49-50 (emphasis added).

[5] Id. at 408 (emphasis added).

[6] Id. at 365.

children--and it didn't have an age deal on it at that point--that they basically would pay--be obligated to pay a school mitigation fee.[7]

David asked Maddy to confirm this understanding with her broker, which he claims she did:

> She told me the next day that she had checked with her broker, Gene Bryson, an[d] that the statute and restrictive covenant allowed for 20% of the units to have children.[8]

Bryson acknowledged he knew that the Davids wanted to rent the unit. Bryson confirmed that he believed at the time that 20 percent of the units could be occupied by families with children.

Maddy and Bryson's understanding of the covenants was based on statements by Nord. Maddy summarized Nord's remarks:

> Basically, we asked [Nord] many times to clarify that. We . . . wanted to make sure that we were correct when we started the project: Twenty percent could be sold to people under 55; if they had children, they pay a school mitigation fee. That was what we were told. That's what we represented.[9]

Bryson testified that Nord stated that "up to 20 percent of the units" could be occupied by families with children.[10] Bryson did not seek an independent legal opinion prior to David's closing because Nord "made it very clear," and "we were relying . . . on what our client told us."[11]

---

[7] Id. at 269.

[8] Id. at 365-66.

[9] Id. at 272.

[10] Id. at 283.

[11] Id. at 284.

5

After the sale, the condominium association filed a lawsuit to enforce the covenant and enjoin the Davids from renting to persons with children. The association prevailed in its lawsuit. The Davids did not appeal.

The Davids filed claims against Bryson, Maddy and Nord for money damages. The amended complaint alleged causes of action for indemnification, fraudulent or negligent misrepresentation, unauthorized practice of law, and Consumer Protection Act[12] (CPA) claims based upon the unauthorized practice of law. The trial court ultimately granted summary judgment, dismissing the lawsuit in its entirety.[13]

The Davids appeal from the order dismissing their lawsuit.

## DISCUSSION

This court reviews summary judgment orders de novo.[14] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[15]

*Unauthorized Practice of Law*

The Davids first argue that Maddy engaged in the unauthorized practice of law when she informed them that the FHA would allow 20 percent of the units to be

---

[12] Chapter 19.86 RCW.

[13] On August 20, 2010, the trial court granted in part Maddy's and Bryson's motions for summary judgment, dismissing all claims except for the CPA violation based on unauthorized practice of law and separate unauthorized practice of law claims. On May 10, 2013, the trial court granted summary judgment in favor of Nord, Maddy and Bryson, dismissing all remaining claims.

[14] Atherton Condo. Apartment-Owners Ass'n v. Blume Dev. Co., 115 Wn.2d 506, 515-16, 799 P.2d 250 (1990).

[15] CR 56(c).

occupied by families with children and that Bryson engaged in the unauthorized practice of law when he confirmed this.

In their briefing to both this court and the trial court, the Davids do not consistently or precisely explain what constituted Maddy's or Bryson's alleged practice of law. The essence of their claim is that Maddy and Bryson stated that the FHA and the restrictive covenants together allowed for up to 20 percent of the units to be occupied by families with children. The Davids contend that Maddy and Bryson interpreted the FHA as allowing "20% of the units to have children notwithstanding the Restrictive Covenant"[16] and that "Nord, Bryson and Maddy all provided in some manner to the Davids legal advice in that they provided an interpretation of the Federal Fair Housing Statute that was incorrect."[17] The Davids urge us to presume the information relayed by Maddy and Bryson was incorrect, but they offer no expert opinion or other evidence as to the standard of care and no argument or authority that would excuse the absence of such evidence.

The practice of law includes providing legal advice and counsel, and preparing legal instruments and contracts by which legal rights are secured.[18] The individual practicing law must abide by and uphold the same rules of professional conduct as members of the Washington State Bar Association.[19] A layperson engaging in the

---

[16] Brief of Appellant at 9.

[17] Id. at 17.

[18] Jones v. Allstate Ins. Co., 146 Wn.2d 291, 301, 45 P.3d 1069 (2002). RCW 2.48.180(2)(a) defines the unlawful practice of law to include instances where "[a] non-lawyer practices law."

[19] See Batten v. Abrams, 28 Wn. App. 737, 739 n.1, 626 P.2d 984 (1981) (non-lawyer who undertakes role of lawyer "assumes the duties and responsibilities [of a lawyer] and is accountable to the same standards of ethics and legal knowledge.").

practice of law "must comply with the standard of care of a practicing attorney" when undertaking such limited practice of law.[20]

The general rule is that "expert testimony should be produced to establish the standard of care contemplated in performing the legal function alleged to have been done negligently."[21] In some cases, it may be appropriate for a trial court to "take judicial notice of the standard of care," especially where negligence is of a type "obvious to anyone with legal training," and the "standard of care was so obviously breached . . . that the court could properly so conclude as a matter of law."[22] But the Davids do not argue that this is such a case. The Davids were required to present evidence addressing "the breach of the legal duty of care, not simply a supposed breach of the ethics rules," and their failure to do so defeats their claim of error.[23] The Davids' claims fail because they provide no evidence regarding the applicable standard of care, the correct legal interpretation of use restrictions, or the FHA. The Davids rely only on

---

[20] Perkins v. CTX Mortg. Co., 137 Wn.2d 93, 106, 969 P.2d 93 (1999); see also Jones, 146 Wn.2d at 304 n.13 ("'The ultimate protection to the public is the requirement that the broker/salesperson be held to the standard of care of a practicing lawyer.'" (quoting Cultum v. Heritage House Realtors, Inc., 103 Wn.2d 623, 636, 694 P.2d 630 (1985))).

[21] Hecomovich v. Nielsen, 10 Wn. App. 563, 572, 518 P.2d 1081 (1974). Expert testimony is often required in legal negligence actions to establish the attorney's duty of care and the breach because the law is highly technical and the alleged negligence is not within the ordinary knowledge of laymen. Geer v. Tonnon, 137 Wn. App. 838, 851, 155 P.3d 163 (2007); see also Walker v. Bangs, 92 Wn.2d 854, 857-58, 601 P.2d 1279 (1979) (expert testimony not necessary where negligence charged was within common knowledge of laypersons but is required in action relating to special area of practice).

[22] Hecomovich, 10 Wn. App. at 572.

[23] Geer, 137 Wn. App. at 851 (where expert testimony was necessary to establish breach of the duty of care and plaintiff failed to proffer any such expert testimony, summary judgment dismissal was appropriate because "there was no evidence that [the] attorney . . . breached any applicable duty").

assertions unsupported by evidence or legal analysis. As was held in Barrett v. Freise, this is insufficient to defeat summary judgment.[24]

A party resisting summary judgment does not satisfy its burden of production by providing conclusory allegations, speculative statements, or argumentative assertions.[25] The limited briefing, argument, and record presented do not meet the Davids' burden to demonstrate a genuine issue of material fact. The Davids place undue significance on Bryson's deposition testimony about his conversation with an attorney after the Davids' purchase.[26] When asked whether the attorney told Bryson "that the 20 percent rule would allow people to rent their condos to other people who had children," Bryson answered "No."[27] The Davids contend that from this statement "[i]t is clear . . . that an attorney would not have given the legal advice" that Maddy and Bryson gave, and that "[s]uch [advice] clearly establishes that Ms. Maddy and Mr. Bryson did not exercise the same standard of care as an attorney."[28] Bryson's ambiguous testimony alone is insufficient to establish that the "20 percent rule" interpretation was an incorrect statement of law. Bryson only stated that after talking to an attorney, he had a different

---

[24] 119 Wn. App. 823, 842, 82 P.3d 1179 (2003) (expert opinion on breach of ethics rules was inadequate to create genuine issue of fact as to breach of lawyer's standard of care).

[25] Las v. Yellow Front Stores, Inc., 66 Wn. App. 196, 198, 831 P.2d 744 (1992).

[26] The Davids argue that the defendants failed to "seek independent legal advice . . . until after closing the David transaction" and that Bryson's testimony proved that "had he done so[,] he would have learned that the legal advice [given to] David was in error." Brief of Appellant at 11.

[27] Clerk's Papers at 283-84.

[28] Brief of Appellant at 13.

view. Bryson was not asked to explain what that meant, and the Davids offer no explanation.

The Davids' citation to Burien Motors, Inc. v. Balch likewise does not demonstrate the existence of a genuine issue of material fact as to whether Maddy or Bryson breached the applicable standard of care.[29] In Burien Motors, the court held that a real estate broker has a duty to know the truth and that an "honest mistake" is not a defense.[30] The court found that the real estate broker failed to investigate applicable zoning requirements, or to advise his client that he didn't know the zoning requirements, and held that this breached the standard of care of an attorney.[31] The critical distinction is that the trial court in Burien Motors was presented with evidence showing the relevant standards of practice and the code of ethics applicable to the real estate agent and that agent's conduct did not conform to these standards.[32] By contrast, the Davids presented no such evidence or opinion.

The Davids rely heavily on Jones v. Allstate Insurance Co.[33] The Jones court held that where non-lawyer insurance company employees prepared legal documents and gave advice affecting legal rights, they "should be held to the standard of care of practicing attorneys."[34] However, Jones does not support the conclusion that any attorney-client relationship existed between the Davids and Maddy or Bryson. The

---

[29] 9 Wn. App. 573, 513 P.2d 582 (1973).

[30] Id. at 577.

[31] Id. at 577.

[32] Id. at 578.

[33] 146 Wn.2d 291, 45 P.3d 1068 (2002).

[34] Id. at 312.

Davids had their own agent, Jessup, prepare the written offer for the property. The actions of Bryson and Maddy and their relationships to the Davids do not support the same conclusion of an attorney-client relationship found in Jones. The Davids acknowledged Maddy was in an adversarial position as the listing agent representing the seller when she relayed information to him. An adversarial relationship is less clearly imputed to Bryson, but there are no allegations that Bryson advised the Davids to sign paperwork or drafted any contract language for them.

The Davids assert that Maddy and Bryson had a duty to advise them to seek independent legal advice. David cites to Graham v. Findahl[35] and Cultum v. Heritage House Realtors, Inc.[36] in which our Supreme Court expressly allowed real estate agents to engage in the practice of law, limited to filling out purchase and sales forms. But the Davids do not adequately brief the similarities and distinctions between his case and Graham or Cultum to support their argument that Maddy or Bryson had a duty to counsel them to seek legal advice. Moreover, because the Davids were represented by their own agent, the practical concerns the courts addressed in Graham and Cultum are not implicated.

The Davids also assert that Maddy was required to disclose that she and Jessup were from the same office and shared office space pursuant to RPC 1.8 and 1.10. But the Davids acknowledged in writing before the sale that they knew that Jessup and Maddy worked for the same company under the same broker, Bryson, and

---

[35] 122 Wn. App. 461, 93 P.3d 977 (2004).
[36] 103 Wn.2d 623, 694 P.2d 630 (1985).

acknowledged in writing that they were aware of Bryson's financial interest in the transaction.

The Davids argue that the disclaimers in the agreement were insufficient to adequately advise them of the conflict of interest, the need for independent legal advice, and the "practical effect" of the FHA. They contend that "[t]he purpose of this rule is to prevent sellers from hiding disclaimers in fine print boilerplate language."[37] But here, the Davids' own agent provided the disclaimers concerning the representations made about the property and their non-reliance on any representations outside of the public offering statement and the purchase and sale documents.

One argument advanced by Maddy and Bryson is not persuasive. They argue that RCW 18.86.030 limited their duty to the Davids because they were "mere conduits of information" from Nord. However, the provisions of RCW 18.86.030, which defines a broker's duties, are inapplicable because RCW 18.86.110 specifically excludes the unauthorized practice of law. If they engaged in the practice of law, the "mere conduit" statute does not apply.

The Davids' claims based on the unauthorized practice of law and resulting CPA violations fail.

### Negligent Misrepresentation

The Davids contend that Nord, Maddy and Bryson assumed an independent duty because they gave false information intending the Davids to rely upon it. Under the theory of negligent misrepresentation:

---

[37] Brief of Appellant at 22.

"(1) One who, in the course of his business . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."[38]

A plaintiff claiming negligent misrepresentation must prove by clear, cogent, and convincing evidence that (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages.[39]

The Davids do not address their arguments to these elements. Instead, they rely heavily on Haberman v. Washington Public Power Supply System, in which our Supreme Court held that attorneys who drafted a prospectus without disclosing the potential risk of investing in nuclear power plants were liable for negligent misrepresentation to those who purchased the bonds.[40] The Davids contend that, like the Haberman plaintiffs, they would not have purchased the unit but for the misrepresentation by Maddy and Bryson that the FHA allowed them to rent the unit to families with children. Haberman involved dismissal pursuant to CR 12(b)(6) and, accordingly, considered hypothetical facts in determining that the claims were improperly dismissed. By contrast, the instant case was decided under the summary judgment standard and the Davids had the opportunity to present evidence. For lack of

---

[38] Haberman v. Washington Public Power Supply System, 109 Wn.2d 107, 161-64, 744 P.2d 1032 (1987), amended, 750 P.2d 254 (1988) (quoting RESTATEMENT (SECOND) OF TORTS, § 552 (1977)).

[39] Ross v. Kirner, 162 Wn.2d 493, 172 P.3d 701 (2007).

[40] Haberman, 109 Wn.2d at 161-64.

evidence of an incorrect interpretation of the FHA and restrictive covenants, the Davids do not establish that Maddy and Bryson were negligent in interpreting the terms of either, or otherwise failed to exercise the required care or competence. On the record presented, a jury would be required to speculate as to these matters. The Davids "cannot rely on speculation and conjecture to raise a genuine issue of material fact."[41]

The Davids suggest that the trial court dismissed their negligent misrepresentation claims based on Carlile v. Harbour Homes, Inc., but do not identify anything in the record showing the court relied on Carlile or misapplied the economic loss rule in reaching its holding.[42]

*Nord*

The Davids sued Nord in his individual capacity, without making any showing that would justify piercing the corporate veil. The trial court held that the Davids failed to demonstrate that Nord was personally liable.

The Davids' only argument is that the dismissal of their claim against Nord "was ostensibly based on the court's finding that no unauthorized practice of law occurred."[43] Because we conclude that the trial court did not err in dismissing the unauthorized practice of law claims and that the Davids do not establish any unlawful act by Nord, the Davids' claims against Nord were properly dismissed.

---

[41] Johnson v. Recreational Equip., Inc., 159 Wn. App. 939, 956, 247 P.3d 18 (2011).

[42] 147 Wn. App. 193, 194 P.3d 280 (2008).

[43] Brief of Appellant at 23.

## CONCLUSION

The trial court's grant of summary judgment was appropriate. The Davids failed to raise any issue of material fact as to either their unauthorized practice of law claims or negligent misrepresentation claims. Their claim against Nord also fails.

Affirmed.

WE CONCUR: