IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| AMY RUSH, | ) | |
| | ) | No. 38422-5-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SUNDOWN M RANCH | ) | UNPUBLISHED OPINION |
| CORPORATION, a Washington State | ) | |
| corporation. | ) | |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, C.J. — Amy Rush appeals the trial court's summary judgment

dismissal of her negligence action against Sundown M Ranch Corporation (Sundown), in

which she sought to recover damages for a slip and fall on an outdoor walkway in

February 2019. Ms. Rush was uncertain what caused her to fall, but assumed it was ice.

Ms. Rush argued she was not required to show that Sundown had actual or

constructive notice of the specific icy patch on which she slipped, because an outdoor

activity in which residents at Sundown were encouraged to participate made it reasonably

foreseeable that persons like herself would encounter unsafe conditions. She also relied

on the fact that she slipped and fell to prove the existence of a dangerous condition that Sundown unreasonably failed to remedy or warn against. While the former argument finds support in the Washington Supreme Court's 2021 decision in *Johnson v. Liquor & Cannabis Board*, 197 Wn.2d 605, 486 P.3d 125, the latter argument does not. Because Ms. Rush failed to present evidence creating a jury question whether Sundown's snow and ice remediation was negligently performed and exposed her to a dangerous condition, summary judgment was proper.

FACTS AND PROCEDURAL BACKGROUND

On February 12, 2019, Amy Rush was a residential patient at Sundown, an inpatient treatment center for substance abuse disorders in Yakima. There had been snow on the ground for nearly the entire week Ms. Rush had resided at Sundown. Weather records for two days preceding February 12 report average temperatures were below freezing, and there had been some accumulation of snow between the evening of February 11 and into the morning of February 12.

At about 8:40 a.m. in the morning on the 12th, Ms. Rush was walking with five other patients for a ceremony to celebrate the completion of the in-patient program by one of the members of their therapy group. The ceremony was a bell ringing, which took place in a gazebo outside the front entrance to Sundown's administration building. To

get there, Ms. Rush and the others went out the front door of the administration building and traveled on a main walkway.

The walkway to the gazebo was covered for a distance by what was sometimes referred to as a portico. Somewhere near where the walkway became uncovered, Ms. Rush reports suddenly slipping and "falling and landing [with] all my weight on my knee and my rear." Clerk's Papers (CP) at 61. She continued to the bell-ringing ceremony, but because she experienced pain in her wrists and knees, she reported the incident to Sundown's administration just before her daily schedule commenced at 9:00 a.m. She eventually required knee surgery.

In November 2019, Ms. Rush filed a personal injury action against Sundown. She alleged it had been negligent in failing to ensure the walkway was safe to walk on and for failing to warn or protect her from the allegedly dangerously slippery condition of the walkway where she fell.

Ms. Rush was deposed almost two years after her fall, in December 2020. She testified as follows:

> Q. . . . [W]hat did you slip on? Was it ice, snow or what?
> A. It was—it was the ground. It was like it was, I assume, ice.
> Q. Did you know—
> A. I don't—yes, I don't recall.
> Q. What were you—what kind of shoes were you wearing?
> A. I believe the only shoes I had when I went in there was a pair of Converse tennis shoes.
> Q. Allstars or something?

3

> A. Yes.
> Q. Did you slip all of a sudden or had you been slipping all the way down that driveway or how did it happen?
> A. No. It just happened all of a sudden.
> Q. Anybody else with you slip at all?
> A. No.

CP at 60.

Sundown moved for summary judgment dismissal of Ms. Rush's complaint. It contended that her alleged fall was in an area where snow removal had been done and other cautionary measures had been taken, no one else reported any problems with slipping in that area earlier in the morning or at any other time, and there had been no requirement or necessity for her to traverse the exterior walkway at the time of her fall.

Among Sundown's supporting evidence was a declaration of its facility manager, Robert Bale. Mr. Bale described the area where Ms. Rush claimed she fell as "one of the main entrances to the adult facility" and stated that for that reason, and because a transfer van is parked in that area, "it is a priority to keep that area shoveled and de-iced." CP at 38. He testified "[i]t is the usual and common practice" of Sundown's maintenance department "to plow driveways and parking lots . . . and [make sure] that sidewalks and walkways are shoveled and de-iced." *Id.* More specifically, he testified:

> 4. Typically if it snows overnight maintenance personnel will arrive at Sundown between 4:00 and 5:00 a.m. to begin plowing. This allows sufficient time to clear driveway and parking areas and walkways prior to when most people will be using them. Timecard records show that a member of the maintenance crew clocked in at 4:50 a.m. on February 12,

2019. This indicates that most probably he was there to plow and apply de-icing.

5. Based upon all this information more probably than not the area where Ms. Rush allegedly says she fell would have been plowed and de-iced prior to 8:30 on the morning of February 12, 2019.

6. Moreover, right inside the door of this entrance during that time and presently a snow shovel is kept as well as a de-icer. Staff and maintenance are instructed that they should shovel any snow accumulations and/or apply de-icer to any potentially slippery areas if they become aware that an area is slippery or presents a slip and fall risk.

. . . .

8. In my work and maintenance, I am not aware of any other person slipping and falling in that area because of the area being slippery because of snow and ice conditions or for any other reason.

CP at 38-39.

Sundown also supported its motion with defense counsel's declaration authenticating weather records, depictions of Sundown's facilities, and excerpts of Ms. Rush's deposition, including her testimony that "all of a sudden" she "slip[ed] . . . on the ground . . . I assume ice." CP at 60. Finally, it supported the motion with a declaration of its adult clinical supervisor, who stated that attending a bell-ringing ceremony was an option, not a requirement, for members of the graduating patient's therapy group.

In opposition to the motion, Ms. Rush submitted a declaration. She now stated, "I slipped and fell on black ice," and "[t]he walkway was very slippery." CP at 140. She also testified that she did not observe any ice melt in the area where she fell. She did not claim that she had looked for signs of ice melt in that area.

Ms. Rush also submitted portions of Mr. Bale's deposition, in which he had admitted that he had no ice melt log or other records documenting the snow and ice remediation done on the morning of February 12. But asked in his deposition if issues involving slippery snow and ice had been an ongoing issue with patients at Sundown, Mr. Bale answered that they had not been.

Ms. Rush argued that although Sundown presented evidence of precautionary measures, "they . . . failed their own measures *as evidenced by the fall*," and "Ms. Rush was injured by the dangerous condition." CP at 89-90 (emphasis added). She argued that "there is no doubt" that reasonable care was not taken to protect against the danger "*as evidenced by the slippery walkway and fall*." CP at 94-95 (emphasis added). She argued, "If [S]undown properly cleared and treated the walkway, *Ms. Rush would not have fell*." CP at 95 (emphasis added).

Ms. Rush argued that evidence of Sundown's policies and procedures for removing and clearing ice and snow is evidence "they had notice of the dangerous condition that they failed to remedy." CP at 95. She also argued that the *Pimentel*[1] exception to the requirement that a possessor of land have actual or constructive notice of a dangerous condition applied to Sundown, because the risk of the dangerous condition

---

[1] *Pimentel v. Roundup Co.*, 100 Wn.2d 39, 666 P.2d 888 (1983).

that resulted in her injury was foreseeable where the bell-ringing ceremony "was an integral part of [Sundown's] recovery program." CP at 93.

Sundown asked the court to disregard Ms. Rush's new testimony that she had slipped on black ice, which conflicted with her unequivocal deposition testimony that she slipped on the ground, and merely assumed it was ice. It submitted a supplemental declaration of Mr. Bale in which he testified he was aware of only one occasion when a patient at Sundown claimed to have slipped and fallen on snow or ice, and it had happened quite a distance from Ms. Rush's alleged fall, and was not near one of the main entrances to the facility.

The trial court ultimately granted Sundown's motion for summary judgment, based in part on a supplemental declaration from Darren Alderman, the maintenance employee who had reported to work at 4:50 a.m. on the morning of Ms. Rush's fall. Mr. Alderman's declaration authenticated his timecard, which was attached as an exhibit, and testified:

> It is my understanding and I have been informed that it was snowing that day and it had been snowing on the previous days. Based upon the clocking in at that time, the reason I would do so was so I could start my job responsibilities of plowing and applying ice melt. One of the areas that has priority because of the frequent travel it has is around the main entrance to the adult facility. Based upon this information, I can state with certainty that I would have not only plowed that area but also applied ice melt. That is one of the areas where we always apply ice melt and I would have done so that day.

7

No. 38422-5-III
*Rush v. Sundown M Ranch Corp.*

CP at 204-05. Ms. Rush appeals.

ANALYSIS

We review an order granting summary judgment de novo, engaging in the same inquiry as the trial court. *Ruvalcaba v. Kwang Ho Baek*, 175 Wn.2d 1, 6, 282 P.3d 1083 (2012). Summary judgment is proper when there is "no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." CR 56(c). All facts and inferences are construed in the light most favorable to the nonmoving party. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002).

A moving defendant meets the initial burden of demonstrating no genuine issue of material fact by pointing out that there is an absence of evidence to support the plaintiff's case. If a moving defendant makes this initial showing, then the plaintiff must set forth specific facts demonstrating a genuine issue for trial. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225-26, 770 P.2d 182 (1989), *overruled in part on other grounds by* 130 Wn.2d 160, 922 P.2d 59 (1996). The complete failure of proof concerning an essential element, "'renders all other facts immaterial.'" *Id.* at 225 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

8

I.     MS. RUSH HAD A SUFFICIENT BASIS FOR INVOKING THE "REASONABLE
       FORESEEABILITY" EXCEPTION TO THE REQUIREMENT THAT AN INVITEE
       DEMONSTRATE A LANDOWNER'S NOTICE OF A DANGEROUS CONDITION

"'The basis of any negligence action is the failure to exercise reasonable care when one has a *duty* to exercise such care.'" *Hvolboll v. Wolff Co.*, 187 Wn. App. 37, 43, 347 P.3d 476 (2015) (quoting *Bodin v. City of Stanwood*, 130 Wn.2d 726, 744, 927 P.2d 240 (1996)).  To prove actionable negligence, a plaintiff must be able to establish: (1) the existence of a duty owed, (2) breach, (3) injury, and (4) proximate cause between the breach and the injury.  *Ford v. Red Lion Inns*, 67 Wn. App. 766, 769, 840 P.2d 198 (1992).

In the premises liability context, the duty of care owed is determined by the common law classification (invitee, licensee, or trespasser) of the person entering upon real property.  *Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 128, 875 P.2d 621 (1984).  On summary judgment, Ms. Rush's status as an invitee was uncontested.  A landowner owes an invitee an affirmative duty to use ordinary care to keep the premises in a reasonably safe condition.  *Degel v. Majestic Mobile Manor, Inc.*, 129 Wn.2d 43, 49, 914 P.2d 728 (1996).  The duty of ordinary care requires the landowner "to inspect for dangerous conditions, 'followed by such repair, safeguards, or warning as may be reasonably necessary for [the invitee's] protection under the circumstances.'" *Tincani*,

9

124 Wn.2d at 139 (alteration in original) (quoting RESTATEMENT (SECOND) OF TORTS § 343 cmt. b (AM. LAW INST. 1965)).

It was long the general rule in Washington that for the owner or occupier of property to be liable for an injury caused by a transitory unsafe condition on property, it must have caused the unsafe condition or it must have had actual or constructive knowledge that the unsafe condition existed. *Witse v. Albertson's, Inc.*, 116 Wn.2d 452, 459, 805 P.2d 793 (1991) (citing *Pimentel*, 100 Wn.2d at 44). Constructive knowledge exists if the unsafe condition has been present long enough that a person exercising ordinary care would have discovered it. *Id.* (citing *Pimentel*, 100 Wn.2d at 44). The plaintiff had the burden of proving that the defendant had actual or constructive knowledge of the unsafe condition. *Id.*

In arguing the summary judgment motion below, the parties spent considerable time arguing the import of the then-new decision in *Johnson v. Liquor & Cannabis Board*, which they agreed expanded an exception to the requirement that an invitee prove a defendant's actual or constructive notice of a dangerous condition. They disagree on the scope of the expansion, and whether it applies to Ms. Rush's claim.

The Washington Supreme Court had first adopted an exception to the notice requirement in *Pimentel*, a case that involved a self-service style store. A can of paint that had been placed or moved to a position where it overhung a store shelf fell, injuring

the plaintiff's foot. 100 Wn.2d at 41. Evidence was presented that too much overhang

creates extreme instability and the risk that an object will fall with the slightest vibration.

*Id.* The *Pimentel* court discussed a judicial trend to modify traditional rules of liability in

light of modern techniques of merchandising, and adopted a rule that notice of a

dangerous condition need not be shown "when the nature of the proprietor's business and

his methods of operation are such that the existence of unsafe conditions on the premises

is readily foreseeable." *Id.* at 49. The court stated that the notice requirement was

eliminated only if "the particular self-service operation of the defendant" is shown to

make such conditions foreseeable. *Id.* at 50.

In *Ciminski v. Finn Corp.*, 13 Wn. App. 815, 818-19, 537 P.2d 850 (1975), this

court observed that the "reasonable foreseeability" exception had been applied

exclusively to self-service stores because of the greater likelihood that items will fall to

the floor where customers, rather than clerks, are handling merchandise. And as recently

as 1994, our Supreme Court stated "[t]here must be a relation between the hazardous

condition and the self-service mode of operation of the business." *Ingersoll v.

DeBartolo, Inc.*, 123 Wn.2d 649, 654, 869 P.2d 1014.

As pointed out two years later in the lead opinion in *Iwai v. State*, a plurality

opinion, however, while *Ingersoll* said the *Pimentel* exception applied only where there

was a relation to a self-service mode of operation, it also said that "'self-service' is not

11

the key to the exception." 129 Wn.2d 84, 100, 915 P.2d 1089 (1996) (quoting *Ingersoll*, 123 Wn.2d at 654). *Ingersol* had treated the key to the exception as being *Pimentel*'s more general concern: whether the nature of a business and its methods of operation "'are such that the existence of unsafe conditions . . . is reasonably foreseeable.'" *Id*. at 100 (quoting *Ingersoll*, 123 Wn.2d at 654 (internal quotation marks omitted)).

*Iwai* involved a plaintiff's slip and fall on a steep section of defendant's parking lot, where there had been a history of vehicles sliding downhill in snowy and icy conditions. The lead opinion reasoned that "[p]laintiff's failure to establish actual or constructive notice of the specific dangerous condition should not preclude a trial court from hearing this case." 129 Wn.2d at 101. It held that the reasonable foreseeability exception adopted in *Pimentel* should apply.

Most recently, in *Johnson*, the plaintiff sustained injuries after slipping and falling on an allegedly wet entryway to a state liquor store, on a rainy afternoon on which store policy called for putting out a "'slippery when wet'" sign. 197 Wn.2d at 608-09. At the time of the plaintiff's fall, the sign had not been put out, and the store clerk testified he was not aware that the area where the plaintiff fell was wet or otherwise hazardous. *Id*. at 608.

The jury returned a verdict in favor of the plaintiff. The trial court denied a State motion for a judgment notwithstanding the verdict; the State had argued in part that the

court should have granted its CR 50 motion to dismiss because Johnson failed to prove

the State had actual or constructive notice of a dangerous condition. The Supreme Court

granted review on the issue of "whether the [reasonable] foreseeability exception to the

notice requirement applies in the context of premises liability actions." *Id.* at 610.

Justice Whitener, writing for a unanimous court, pointed out that *Ingersol*

presaged an expansion of the reasonable foreseeability exception when it pointed out that

"'self-service' is not the key." *Id.* at 615 (quoting *Ingersoll*, 123 Wn.2d at 654). *Iwai*

continued the expansion when the lead opinion reasoned that the exception "applies in

essentially *any* premises liability context involving an invitee," including *Iwai*'s context

of a slip and fall in an icy parking lot. *Id.* at 616. While noting that the lead opinion in

*Iwai* garnered only four votes, the opinion in *Johnson* characterized Justice Alexander's

concurrence in *Iwai* as "indirectly support[ing] the expansion of the exception" because

he agreed with the result and viewed it as unnecessary to rely on *Pimentel*—he would

have tied expansion of the exception to *Restatement (Second) of Torts* § 343. *Id.* at

616-17.[2]

---

[2] Justice Alexander's concurrence in *Iwai* and footnote 4 in *Johnson* suggest that members of the court other than former Justice Alexander view section 343 of the *Restatement* as not an entirely correct or perhaps not a complete statement of Washington common law. Footnote 4 in *Johnson* states that section 343 has not replaced Washington's notice requirements. And in *Iwai*, the four justices signing the lead opinion evidently disagreed with Justice Alexander's statement that the expansion they were endorsing could be accomplished by relying on section 343 as stating Washington common law.

13

Finally, *Johnson* characterizes the expansion of the reasonable foreseeability

exception to the notice requirement as "completed" by *Mucsi v. Graoch Associates Ltd.*

*Partnership No. 12*, 144 Wn.2d 847, 31 P.3d 684 (2001), a case involving an invitee who

slipped and fell on ice outside an apartment complex. *Johnson*, 197 Wn.2d at 617. It

was demonstrated in *Mucsi* that the owner of the apartment complex had actual notice of

the allegedly dangerous accumulation of snow and ice on the walkways from the exits.

Nevertheless, in discussing the applicable law, Justice Chambers's opinion twice referred

to the reasonable foreseeability exception as an alternative to a plaintiff demonstrating

actual or constructive notice.[3] The State protested to the court in *Johnson* that Justice

Chambers's references in *Mucsi* were dicta, because the plaintiff in that case presented

sufficient evidence of actual notice. *Johnson* rejects the "dicta" characterization, stating

that its disposition of a case and commands on remand cannot be said to be unrelated to

an issue before the court and unnecessary to its decision. *Id.* at 618.

Considering the three cases, *Johnson* observes that "[o]ur precedent has made the

exception from *Pimentel* into a general rule," and "[t]he self-service requirement of the

[rule] no longer applies." 197 Wn.2d at 618.

---

[3] *Johnson* points to statements in the opinion that "in *Iwai*, this Court also determined, where the plaintiff is unable to establish actual or constructive notice, the plaintiff may present evidence to establish the unsafe condition was reasonably foreseeable," and later, in its remand instructions, "There must be evidence of actual or constructive notice or foreseeability, and a reasonable time to alleviate the situation.'" 197 Wn.2d at 617 (emphasis omitted) (quoting *Mucsi*, 144 Wn.2d at 859, 863).

14

Ms. Rush presented evidence that while a resident at Sundown she was invited, and in her view, encouraged, to travel outside when a member of her therapy group engaged in the bell-ringing ceremony. Particularly for persons at a residential treatment facility who could foreseeably arrive with footwear that is not snow and ice-worthy—Ms. Rush's Converse tennis shoes, for instance—she argues that a method of operation that has residents traversing outdoor walkways following snowstorms, in sub-freezing temperatures, presents the existence of an unsafe condition on the premises that is reasonably foreseeable.

Sundown characterizes the *Johnson* exception as "narrow," Br. of Resp't at 34, and as inapplicable here. It argues that "the core of the *Johnson* rule" is public foot traffic that increases the chance of an unsafe condition, such as the foot traffic in and out of the state liquor store in that case. *Id.* at 36. It argues that the expanded rule does not apply to the operation of a residential treatment center that does not experience public foot traffic and whose operation it contends is "completely unconnected" to the existence of an unsafe condition created by inclement weather. *Id.* at 37. It likens this case to *Wiltse,* in which water on a supermarket floor was the result of a leaking roof, which the court in *Wiltse* observed "could give way suddenly, unforeseen and without notice." 116 Wn.2d at 456. That risk was held *not* to be inherent in the supermarket's mode of operation. Sundown argues that "falling of snow and accumulation of ice on the

15

Defendant's premises is not inherent in Defendant's mode of operation."  Resp't's Resp.

Br. at 39.

We are persuaded that Ms. Rush has presented sufficient evidence to invoke the

reasonable foreseeability exception to the notice requirement.  None of the reasoning of

*Johnson* and predecessor cases supports Sundown's effort to limit the exception to

dangerous conditions created indoors by public foot traffic and to exclude modes of

business operation that subject invitees to dangerous conditions outdoors.  We note that

historically, landowners had no duty to protect invitees from natural accumulations of

snow and ice, and early Washington courts followed this rule in the landlord-tenant

context—but in 1975 that distinction was "flatly rejected" in *Geise v. Lee*, 84 Wn.2d 866,

529 P.2d 1054 (1975).  *Geise* adopted the reasoning of a Connecticut decision that found

"'the fact that a particular danger arose from the fall of snow or the freezing of ice can

afford no ground of distinction'" that should limit a landlord's duty to exercise

reasonable care.  *Id.* at 869 (quoting *Reardon v. Shimelman*, 102 Conn. 383, 128 A. 705,

706 (1925)).

Similarly, the fact that a landowner's mode of operation takes invitees to a

dangerous condition outside, rather than subjecting them to a public foot traffic-created

dangerous condition inside, "can afford no ground of distinction" limiting the

landowner's duty to its invitees.  Ms. Rush presented sufficient evidence to invoke the reasonable foreseeability exception.

II.   MS. RUSH FAILED TO PRESENT EVIDENCE CREATING A JURY QUESTION ON THE ESSENTIAL ELEMENT OF NEGLIGENCE

As *Johnson* and earlier precedent makes clear, in order to survive the type of summary judgment motion presented by Sundown, a plaintiff permitted to rely on the reasonable foreseeability exception to the notice requirement must still present evidence of unreasonable conduct by the defendant and the existence of a dangerous condition.

*Johnson* is only the most recent in a line of cases holding that evidence that the plaintiff slipped and fell does not establish that a dangerous condition existed.  As *Johnson* explains:

> Removing the self-service requirement does not obviate the need to prove the existence of the unreasonably dangerous condition itself. . . .
>
> Determining whether an unreasonably dangerous condition existed is not automatic.  This is especially true in slip and fall cases.  "It is well established in the decisional law of this state that something more than a slip and a fall is required to establish . . . the existence of a dangerous condition."  *Brant v. Mkt. Basket Stores, Inc.*, 72 Wn.2d 446, 448, 433 P.2d 863 (1967). . . .  [O]ne cannot establish the existence of a dangerous condition merely by proving "that [one] slipped and fell on a wet floor." *Id.* at 451.

197 Wn.2d at 618-19 (first and third alteration in original).  *Brant* itself cites three pre-1967 decisions for Washington's "well established . . . decisional law" that something more than a slip and fall is required to establish a dangerous condition.  One of those

17

cases, *Pement v. F.W. Woolworth Co.*, 53 Wn.2d 768, 337 P.2d 30 (1959), cites additional cases. Later cases standing for the same proposition include *Wiltse*, 116 Wn.2d at 458-59 (judgment affirmed; plaintiff failed to prove that the defendant permitted a dangerous condition to exist); *Ford*, 67 Wn. App. at 773 (summary judgment appropriate where plaintiff presented no evidence of an unreasonable risk); and *Frederickson v. Bertolino's Tacoma*, 131 Wn. App. 183, 190, 127 P.3d 5 (2005) (summary judgment appropriate where plaintiff did not know what was wrong with chair or caused it to collapse).

Ms. Rush also failed to rebut Sundown's evidence that it employed reasonable procedures designed to make its walkways safe in winter conditions. Sundown presented evidence that it had in place and followed procedures for plowing, shoveling, and applying ice melt, and that it maintained snow shovels and ice melt at key entryways and instructed its employees to reapply remediation measures if slippery areas were encountered or reported. Ms. Rush's only response, in addition to pointing out that she fell, is to argue that Sundown did not create contemporaneous documentation while taking remediation action on February 12, 2019, so it "has no evidence" it did any remediation. Br. of Appellant at 3-5. Sundown's witnesses' sworn, unrebutted testimony to the procedures it followed was sufficient.

18

No. 38422-5-III
*Rush v. Sundown M Ranch Corp.*


Affirmed.[4]

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.


_____
Siddoway, C.J.


WE CONCUR:


_____        _____
Fearing, J.                                                 Staab, J.


---

[4] Sundown also argues that we can affirm summary judgment based on its affirmative defense of implied primary assumption of the risk. As this court recently explained in *Little v. Rosauers Supermarkets, Inc.*, the principle that a possessor of land is not liable to an invitee for physical harm from a condition on the land whose danger is known or obvious to the invitee does not apply if the possessor should anticipate the harm despite such knowledge or obviousness. No. 38724-1-III, slip op. at 5-7 (Wash. Ct. App. Dec. 13, 2022), https://www.courts.wa.gov/opinions/pdf/387241_pub.pdf. To be entitled to the defense, Sundown would need to prove both that (1) Ms. Rush had a full subjective understanding of the presence and nature of the risk and voluntarily chose to encounter it, and (2) this was not a situation in which Sundown could and should have anticipated harm despite her knowledge and the condition's obviousness, e.g., because to a reasonable resident the advantages of encountering the danger outweigh the apparent risk. *Id.*

Sundown is unable to point to any admission by Ms. Rush that she had a full subjective understanding of the risk, and she denies that she did. And as in *Little*, the evidence she proffers falls comfortably within the principle that implied primary assumption of the risk does not apply if the possessor of land should nevertheless anticipate the harm.

19